Mayagüezanos por la Salud y el Ambiente, Inc., opositora apelante, *v.* Junta de Calidad Ambiental, apelada.

*Números:* AA-95-15      *Resueltos:* 3 de junio de 1996
AA-95-16

*Cindy Ginés Sánchez* y *Miguel Sarriera Román,* abogados de la apelante; *Néstor Durán, Odette Portuondo Díaz* y *Laura T. Rozas,* de *McConnell Valdés, Jorge García Díaz, María V. Mercado Rondón, Mónica Ballestero Pascual* y *Eduardo González Isales,* abogados de la apelada; *Orlando Cabrera Rodríguez, Karín G. Díaz Toro* y *José A. Cepeda Rodríguez,* de *Goldman, Antonetti & Córdova,* abogados de Bumble Bee International, Inc., recurrida y apelante.

— o —

Voto particular de conformidad emitido por el Juez Asociado Señor Hernández Denton.

A tenor con la Ley de la Judicatura de Puerto Rico de 1994, Ley Núm. 1 de 28 de julio de 1994 (22 L.P.R.A. sec. 22 *et seq.*), la organización Mayagüezanos por la Salud y el Ambiente, Inc. (en adelante Mayagüezanos) presentó ante nos, el 7 de marzo de 1995, sendas apelaciones de dos (2) resoluciones emitidas por la Junta de Calidad Ambiental (en adelante Junta) en relación con la otorgación de un certificado de calidad de agua a Mayagüez Water Treatment Co., Inc. (en adelante Mayagüez Water Treatment). Aunque coincidimos con la resolución emitida por el Tribunal en la cual se accede a la moción de desistimiento de la apelación presentada por Mayagüezanos, hemos decidido exponer estas reflexiones sobre la controversia del caso de autos.

I

El caso de epígrafe surgió a raíz de la concesión por la Junta de un certificado de calidad de agua a Mayagüez Water Treatment. Desde 1977 dicha compañía recibe las aguas usadas descargadas por Star Kist Caribe, Inc. y Bumble Bee International, Inc., que son compañías que procesan y empacan atún en Mayagüez. Mayagüez Water Treatment recoge las aguas usadas, las somete a un tratamiento y luego las descarga en la bahía de Mayagüez. Actualmente dicha compañía está en el proceso de renovación de su permiso federal de descargue de aguas.

La Ley de Agua Limpia federal (*Clean Water Act*) prohíbe cualquier descarga de contaminantes en las aguas de Estados Unidos, en violación de dicha ley. 33 U.S.C. sec. 1311(a). Dispone que no se permitirán las descargas en ausencia de un permiso expedido por la Agencia de Protección Ambiental federal bajo el Sistema Nacional para la Eliminación de Descargas de Contaminantes (*National Pollutant Discharge Elimination System*), conocido como permiso N.P.D.E.S., por sus siglas en inglés. 33 U.S.C. sec. 1342. Los permisos N.P.D.E.S. contienen los términos y las condiciones necesarios para que la descarga cumpla con los requisitos de la Ley de Agua Limpia federal. Particularmente, establecen los límites de efluente para las diferentes sustancias contaminantes de la descarga.

Antes de emitir un permiso federal de descarga de aguas, la Agencia de Protección Ambiental federal debe obtener un certificado de calidad de agua de la agencia estatal con jurisdicción sobre el cuerpo de agua receptor de la descarga. 33 U.S.C. sec. 1341(a)(2). El certificado de calidad de agua es un documento emitido por la agencia estatal, en el que se imponen una serie de condiciones para que una descarga de aguas usadas se realice cumpliendo con las leyes y los reglamentos del estado correspondiente. Posteriormente, las condiciones impuestas en el certificado estatal son incorporadas al permiso federal. En el caso de Puerto Rico, la Ley sobre Política Pública Ambiental le confiere a la Junta la facultad para emitir los referidos certificados. 12 L.P.R.A. secs. 1131 y 1135.

La Junta aprobó el Reglamento de Estándares de Calidad de Agua para cumplir con su autoridad de reglamentar las actividades que puedan contaminar las aguas. Art. 11(13) de la Ley sobre Política Pública Ambiental, 12 L.P.R.A. sec. 1131(13). En dicho reglamento se clasifican las aguas de acuerdo con los usos permitidos y se establecen las concentraciones de sustancias contaminantes, lla-

madas estándares de calidad de aguas, que no podrán ser excedidas.

El 27 de marzo de 1992, la Agencia de Protección Ambiental federal solicitó a la Junta la emisión de un certificado de calidad de agua a favor de Mayagüez Water Treatment, quien había presentado una solicitud para renovar su permiso N.P.D.E.S. En junio de 1993, la Junta notificó al público su intención de emitir un certificado de calidad de agua a favor de dicha compañía. Se celebró una vista pública el 30 de octubre de 1993, a la cual comparecieron Mayagüezanos y otros ciudadanos interesados. Durante dichas vistas se sugirió la posibilidad de definir una zona de mezcla.(1) La Junta determinó que era necesario realizar otros estudios antes de emitir el certificado.

El 26 de julio de 1994, Mayagüez Water Treatment sometió a la Junta una solicitud final para un certificado de calidad de agua en la que se definía una zona de mezcla. La Junta emitió entonces otra notificación al público de su intención de emitir un certificado de calidad de agua. Se programó una vista pública para el 27 de agosto de 1994. Mayagüezanos solicitó que se tradujera al español el borrador del certificado referido. La Junta accedió y pospuso la vista para el 1ro de octubre de 1994.

Mayagüezanos compareció de nuevo a la segunda vista y sometió unos testimonios orales y escritos. Mediante la Resolución Núm. R-94-36-1 de 1ro de noviembre de 1994, la Junta expidió un certificado de calidad de agua a Mayagüez Water Treatment. Mayagüezanos presentó una moción de reconsideración, la cual fue denegada.

La Junta procedió a enviar el certificado de calidad de agua a la Agencia de Protección Ambiental federal para que ésta pudiese continuar con el proceso de renovación del permiso federal de descarga de aguas N.P.D.E.S. a Maya-

---

(1) Una zona de mezcla se define como un "[e]spacio tridimensional en un cuerpo receptor de agua donde la descarga se diluye con las aguas circundantes". Art. 1 del Reglamento de Estándares de Calidad de Agua, Junta de Calidad Ambiental, 20 de julio de 1990, pág. 27.

güez Water Treatment. Dicha agencia federal preparó un borrador de permiso N.P.D.E.S. y notificó al público su intención de emitir el referido permiso mediante un edicto publicado el 8 de marzo de 1995 en un periódico local. El edicto referido avisaba a todas las personas interesadas que debían someter sus comentarios escritos al borrador del permiso N.P.D.E.S. no más tarde del 8 de mayo de 1995. Se señaló una vista pública para el 8 de abril de 1995. Posteriormente, se pospuso para el 20 de mayo y se extendió el término para someter los comentarios por escrito hasta el 8 de junio de 1995.

A tenor con el Art. 3.002(e) de la Ley de la Judicatura de Puerto Rico de 1994 (4 L.P.R.A. sec. 21i(e)), Mayagüezanos apeló ante nos de dos (2) resoluciones emitidas por la Junta el 6 y 7 de febrero de 1995, en relación con la otorgación del certificado de calidad de agua a Mayagüez Water Treatment. La Resolución de 6 de febrero declaró no ha lugar a la moción de reconsideración presentada por Mayagüezanos en la que alegó incumplimiento con el Art. 4(c) de la Ley sobre Política Pública Ambiental, 12 L.P.R.A. sec. 1124(c), en el proceso de emisión del certificado de calidad de agua. La Resolución de 7 de febrero, por su parte, confirmó la Resolución de 1ro de noviembre de 1994 en la cual se otorgó el certificado de calidad de agua. Consolidamos ambos recursos.

En la Apelación Núm. AA-95-16, en la que se impugna la Resolución de 6 de febrero de 1995, Mayagüezanos adujo que el certificado de calidad de agua otorgado a Mayagüez Water Treatment era inválido debido a que durante el proceso de su otorgación, la Junta no cumplió con el Art. 4(c) de la Ley sobre Política Pública Ambiental, *supra.*

En la Apelación Núm. AA-95-15, en la que se impugna la Resolución de 7 de febrero de 1995, señaló la comisión de tres errores. Como primer error, alegó que la Junta actuó de forma ilegal al delimitar una zona de mezcla utilizando un flujo de descarga inflado de 5.7 millones de galones por

día, en violación de los Arts. 5.5 y 5.6 del Reglamento de Estándares de Calidad de Agua, Junta de Calidad Ambiental, 20 de julio de 1990, y las Guías de Zona de Mezcla y de Bioensayos.

En segundo lugar, Mayagüezanos planteó que los límites de efluente violaban la política de antiflexibilización establecida en la Sec. 402 de la Ley de Agua Limpia federal, 33 U.S.C. sec. 1342, por ser más laxos que los límites vigentes y que el nivel de control de contaminación ya alcanzado por Mayagüez Water Treatment.

Finalmente, adujo que la Junta violó el Art. 5.4.3 del Reglamento de Estándares de Calidad de Agua, *supra*, al autorizar una zona de mezcla interina a un peticionario que no había probado que los sólidos de la descarga no se depositarían en el fondo del cuerpo de agua receptor.

El 29 de agosto de 1995 declaramos con lugar una moción en auxilio de jurisdicción presentada por Mayagüezanos y paralizamos los efectos del certificado de calidad de agua emitido por la Junta a Mayagüez Water Treatment para preservar nuestra jurisdicción apelativa. Además de la Junta y Mayagüezanos, han comparecido ante nos Mayagüez Water Treatment y las atuneras Star Kist Caribe, Inc. y Bumble Bee International, Inc.

II

En vista de la información publicada recientemente sobre el acuerdo entre Mayagüezanos y las atuneras Star Kist Caribe, Inc. y Bumble Bee International, Inc. en relación con el caso *Mayagüezanos por la Salud y El Ambiente, Inc. v. Mayagüez Water Treatment Company, Inc; Star Kist Caribe, Inc; Bumble Bee International, Inc.*, Caso Núm. 94-2491, el cual se encuentra pendiente ante la Corte de Distrito de Estados Unidos para el Distrito de Puerto Rico, emitimos una Resolución el 1ro de mayo de 1996. En ésta le concedimos a las partes un término para que informasen

el efecto de dicho acuerdo sobre la apelación pendiente ante este Tribunal. El acuerdo surgió como consecuencia de una demanda presentada ante el foro federal por la organización ambientalista contra la compañía de descarga de aguas y las atuneras, por violaciones a la Ley de Agua Limpia federal, 33 U.S.C. sec. 1311 *et seq.*

En sus respectivos escritos, las partes nos informaron que el acuerdo entre Mayagüezanos y las compañías atuneras estaba siendo revisado por la Agencia Federal de Protección Ambiental y el Departamento de Justicia federal, ya que la Ley de Agua Limpia federal requiere un período de espera de cuarenta y cinco (45) días para que dichas agencias puedan revisarlo. Una vez las agencias federales endosaran el acuerdo, éste tenía que ser sometido a la Corte de Distrito de Estados Unidos para el Distrito de Puerto Rico para su aprobación final. Mayagüezanos nos adelantó que, de aprobarse el acuerdo, solicitaría mediante una moción de desistimiento voluntario la desestimación de las apelaciones pendientes ante este Tribunal.

Posteriormente, compareció Mayagüez Water Treatment para informarnos que, mediante una carta de 8 de mayo de 1996, el Departamento de Justicia federal y la Agencia de Protección Ambiental federal informaron a la Corte de Distrito de Estados Unidos para el Distrito de Puerto Rico que no tenían objeción al acuerdo y renunciaron al balance del término reglamentario de cuarenta y cinco días (45) con que contaban para considerar dicho acuerdo.

Finalmente, Mayagüezanos presentó ante este Tribunal, el 28 de mayo de 1996, una moción de desistimiento voluntario, conforme a la Regla 35 del Reglamento de este Tribunal, 4 L.P.R.A. Ap. XXI.(²) Alega que las apelaciones

---

(²) Actualmente, la moción de desistimiento ante este Foro está reglamentada en la Regla 32 del Reglamento del Tribunal Supremo de Puerto Rico, 4 L.P.R.A. Ap. XXI-A, que entró en vigor el 1ro de mayo de 1996. No obstante, la Regla 6 de Transición sobre la aplicación de dicho reglamento dispone que todo recurso de apelación, revisión o *certiorari* pendiente ante la consideración de este Tribunal se continuará

respondían al hecho de que las actuaciones de la Junta en el proceso de otorgación del certificado de calidad de agua a Mayagüez Water Treatment habían tenido el efecto de permitir que una mayor cantidad de contaminantes fuera descargada en la bahía de Mayagüez. La parte apelante argumenta que esta preocupación ha sido adecuadamente atendida por el acuerdo con las compañías atuneras como consecuencia del pleito incoado ante el tribunal federal.

Como parte del acuerdo, Mayagüez Water Treatment acordó instalar una planta de lodos activados con capacidad para remover una porción sustancial de contaminantes como los sólidos suspendidos, la demanda bioquímica de oxígeno, aceites, grasas, nitrógeno y fosfato, cuyo efecto será mejorar el tratamiento brindado a los efluentes que descarga en la bahía de Mayagüez. Véanse los párrafos 5 y 7 del acuerdo. Mayagüezanos nos indica que la construcción de dicha planta atiende las preocupaciones recogidas en el primer y el tercer error planteados en la Apelación Núm. AA-95-15.

Mayagüezanos señala, además, que su reclamo en cuanto a la violación de la política de antiflexibilización de los límites de efluentes establecida en la Ley de Agua Limpia federal, que está recogido en el segundo señalamiento de error de la Apelación Núm. AA-95-15, ha sido atendido por el acuerdo de Mayagüez Water Treatment de acatar límites que son, para ciertos parámetros, más restrictivos que los establecidos en el certificado de calidad de agua impugnado. Véase el párrafo 8 del acuerdo.

En relación con el planteamiento de violación al Art. 4(c) sobre la Ley de Política Pública Ambiental, *supra*, único error presentado en la Apelación Núm. AA-95-16, nos indica que éste será atendido, puesto que Mayagüez Water Treatment se comprometió a realizar unos estudios adicio-

tramitando según la ley y el Reglamento vigentes al momento que fue presentado ante este Foro. Por lo tanto, la regla que aplica es la Regla 35 del anterior reglamento, 4 L.P.R.A. Ap. XXI, aprobado el 13 de enero de 1995, como correctamente señala la apelante.

nales que permitirán evaluar con mayor precisión la situación actual de la bahía de Mayagüez. Entre los estudios que se deben realizar se encuentran estudios de bioacumulación, toxicidad, sedimentación y migración de bacterias. Véanse los párrafos 14, 15, 16 y 18 del acuerdo. Además, Mayagüez Water Treatment donará quinientos mil dólares ($500,000) a la Universidad de Puerto Rico para la realización de un estudio de tres (3) años de duración sobre la ecología de la bahía. Véase el párrafo 24 del acuerdo.

Por último, Mayagüezanos nos indica que el acuerdo ha sido debidamente aprobado por la Corte de Distrito de Estados Unidos para el Distrito de Puerto Rico. Concluye de la manera siguiente:

> En vista de que El Acuerdo resultará en una mejora sustancial a la calidad ambiental de la Bahía de Mayagüez, la opositora-apelante MSA desiste voluntariamente y con perjuicio de las dos apelaciones presentadas ante este Honorable Tribunal, conforme la Regla 35 del Reglamento del Tribunal Supremo de Puerto Rico.

### III

Al momento de presentarse la moción de desistimiento voluntario, los procedimientos ante este Tribunal se encontraban en una etapa sumamente avanzada. No obstante, en vista de que Mayagüezanos nos informa que sus reclamos en relación con el certificado de calidad de agua otorgado por la Junta a Mayagüez Water Treatment han sido atendidos por el acuerdo suscrito, concurro con que procede anular el auto expedido y desestimar las apelaciones presentadas. Confiamos en que la empresa cumplirá estrictamente con los acuerdos y que tomará las medidas correspondientes para superar los requisitos establecidos en el certificado de calidad de agua emitido por la Junta. Aunque esta estipulación parece indicar que al momento de emitir la certificación la Junta no tenía suficiente información para determinar el impacto de su permiso sobre la

bahía, y que no cumplió estrictamente con sus propios Reglamentos de Estándares de Calidad de Agua, el acuerdo entre Mayagüezanos y la empresa asegura que se harán los estudios adicionales y que se instalará el equipo que resolverá los problemas que motivaron la impugnación del certificado.

No olvidemos que la Junta se creó con el propósito de establecer normas de calidad y pureza del ambiente y de tomar las medidas necesarias para proteger nuestros sistemas ecológicos. Dicho mandato requiere que la agencia se asegure de que se cumpla con su reglamento. Por lo tanto, la Junta tiene el deber primario de cumplir estrictamente con sus propias normas al aprobar cualquier permiso como el de autos. De lo contrario, actúa contrario a la política pública.

Es menester señalar que elogiamos los esfuerzos realizados por Mayagüezanos y las compañías atuneras para resolver las controversias existentes entre ellas; los cuales, sin duda alguna, redundarán en beneficio del pueblo de Puerto Rico, en cuyo patrimonio ecológico la bahía de Mayagüez ocupa un sitial de gran importancia.

Por las razones antes expuestas, coincidimos con el Tribunal en que procede anular el auto expedido y desestimar las apelaciones presentadas.