EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Juan Hernández, José Juan Álvarez y Otros<br>        Peticionarios<br><br>                vs.<br><br> Centro Unido de Detallistas, Etc.<br>        Recurridos<br><br>Junta de Planificación<br>        Agencia Revocada | Certiorari<br><br>2006 TSPR 131<br><br>168 DPR _____ |

Número del Caso: CC-2004-816

Fecha: 10 de agosto de 2006

Tribunal de Apelaciones:

> Región Judicial de Mayagüez

Juez Ponente:

> Hon. Jocelyn López Vilanova

Abogados de la Parte Recurrida:

> Lcda. Leonor Porrata-Doria
> Lcdo. Carlos M. Declet

Abogados de la Parte Peticionaria

> Lcdo. Pedro E. Ortiz Álvarez
> Lcdo. Daniel Martínez Oquendo
> Lcdo. Fernando Molini Vizcarrondo

Abogada de la Junta de Planificación:

> Lcda. María Cruz Román

Materia: Revisión Administrativa procedente de la Junta de Planificación de P.R.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Juan Hernández, José Juan
Álvarez y Otros
    Peticionarios

        vs.

Centro Unido de Detallistas,       CC-2004-816     Certiorari
Etc.
      Recurridos


Junta de Planificación
     Agencia Revocada


Opinión del Tribunal emitida por el Juez Asociado SEÑOR FUSTER BERLINGERI.


San Juan, Puerto Rico, a 10 de agosto de 2006.


El caso de autos nos presenta la ocasión, *inter alia*, para expresarnos acerca del requisito de presentar un estudio hidrológico-hidráulico cuando se interesa ubicar un proyecto en un área inundable clasificada Zona 2.


I

El 9 de marzo de 2001 Juan A. Hernández, José Juan Álvarez y José Juan Ortiz Rivera (en adelante los proponentes o los peticionarios) presentaron una consulta de ubicación ante la Junta de Planificación de Puerto Rico. El objetivo de la consulta, según ésta fue aprobada finalmente

por la Junta, era desarrollar un proyecto comercial en un solar localizado en el lado sur de la Carretera Estatal Núm. 342, km 0.3 del Barrio Sabanetas de Mayagüez. El proyecto consistía de la construcción de un edificio de bloques y acero estructural de 136,791 pies cuadrados. Dicha estructura se utilizaría para la venta de artículos del hogar, ferretería liviana y accesorios para automóviles.[1] Además, se construirían tres edificios de 3,500 pies cuadrados cada uno para restaurantes de comida rápida y un edificio de 6,000 pies cuadrados para una sucursal bancaria.

El predio objeto de consulta colinda por el norte con la Carretera Estatal 342, por el sur con terrenos pertenecientes a José Garnier, al este con terrenos de la Autoridad de Acueductos y Alcantarillados y al oeste con terrenos de la Autoridad de Energía Eléctrica. Dicho predio está comprendido dentro de un distrito de zonificación Residencial Cero (R-0).[2] Debido a la naturaleza del proyecto, los proponentes

---

[1] Originalmente, dicho proyecto sería operado por la firma Costco. No obstante, ésta abandonó el proyecto al no poder completar las negociaciones con el dueño del predio.

[2] Sobre los propósitos del Distrito de Zonificación R-0, la sección 10.01 del Reglamento de Zonificación de Puerto Rico, Reglamento de Planificación Núm. 4 de la Junta de Planificación, Reglamento Núm. 6211, Departamento de Estado, efectivo el 5 de noviembre de 2000, pág. 65 (en adelante Reglamento de Zonificación) dispone, en lo aquí pertinente, que:

> Este distrito especial de baja densidad poblacional, con solar mínimo de ocho mil (8,000) metros cuadrados, se establece para facilitar el control de la expansión o crecimiento urbano; proteger la utilidad de las vías arteriales; preservar terrenos de alta productividad agrícola; proteger áreas que requieran la preservación de su flora o fauna por su

CC-2004-816                    3

solicitaron que se cambiara la zonificación del predio a un

distrito Comercial Central Intermedio (C-2), [3] o el que

_____
          importancia económica, ecológica o científica; y
          proteger el disfrute y preservación de recursos
          de    interés    público   tales   como    rasgos
          topográficos,   bosques,   arboledas,   paisajes,
          formaciones  geológicas,  manantiales,  quebradas,
          ríos,  lagos,  lagunas,  fuentes  naturales  de  agua,
          mangles,   yacimientos   minerales   o   playas.
          Reglamento de Zonificación, supra, pág. 65.

La  sección  10.02  del  Reglamento  de  Zonificación,  por  su
parte,  establece  los  usos  que  serán  considerados  para
aprobación dentro de los Distritos R-0:

          1.  **Usos agrícolas,** incluyendo puestos para la
              venta al detal de los productos cosechados en
              el   predio,   siempre   que   cada   puesto   se
              construya a una distancia no menor de seis
              (6) metros de la línea de la vía, que no
              tenga más de una (1) planta y no ocupe un
              área   mayor   de   veinticinco   (25)   metros
              cuadrados. Los productos para la venta serán
              los frutos que se cosechan o producen en su
              forma natural, directamente en los terrenos
              donde  se  interese  establecer  el  puesto,  La
              carne  no  se  considerará  como  un  producto
              cosechado en el predio.

          . . .

          4.  **Desarrollos  extensos  de  conformidad  con  las
              disposiciones  de  las  Secciones  79.00,  80.00  y
              81.00  de  este  Reglamento.** Reglamento  de
              Zonificación,  *supra*,  pág.  65.  (Énfasis
              suplido).

     [3] En la sección 22.01 del Reglamento de Zonificación, se
indica  que  el  Distrito  C-2  "se  establece  para  clasificar
áreas  comerciales  existentes  o  para  crear  nuevas  áreas  que
suplan  las  necesidades  de  varios  vecindarios  o  núcleos
residenciales". Reglamento de Zonificación, *supra*, pág. 107.
En  la  Sección  22.02  de  dicho  reglamento  se  establecen  **los
usos  que  serán  permitidos  en  los  Distritos  C-2,  entre  los  que
se  encuentran:  comercio  de  neumáticos,  accesorios  y  piezas  de
vehículos   de   motor   y   bicicletas,   comercio   al   detal   de
artículos  de  consumo  o  uso  corriente  en  el  hogar,  desarrollos
extensos** de  conformidad  con  las  disposiciones  de  las
Secciones  79,00,  80.00  y  81.00  del  Reglamento  de
Zonificación,  ferretería  para  ventas  al  detal,  que  no
incluyan  venta  de  madera,  arena,  piedra,  cemento,  cal,
varillas  de  acero,  u  otro  materiales  de  construcción  pesados,
etc. Reglamento de Zonificación, *supra*.

correspondiera de acuerdo al Plan de Ordenación Territorial del Municipio de Mayagüez. Para fundamentar dicha petición, los proponentes se ampararon en las disposiciones del Reglamento de Zonificación que regulan respectivamente los cambios de zonificación mediante consulta de ubicación, y los desarrollos extensos.

El terreno donde se construiría el proyecto tenía una cabida de 38.15 cuerdas, de las cuales se desarrollarían 21.43 cuerdas. Las restantes 16.72 cuerdas quedarían como un remanente de la finca. El predio estaba ubicado dentro de los límites de una Zona inundable 2, según el Mapa de Zonas Susceptibles a Inundación de la Junta de Planificación.

Después de solicitarle a los proponentes que presentaran información adicional y que clarificaran ciertas inconsistencias, el 11 de julio de 2001, la Junta expidió un aviso de vista pública a celebrarse el día 30 de dicho mes. El interventor Centro Unido de Detallistas compareció a dicha vista y planteó que el proyecto, que originalmente había sido caracterizado como de carácter industrial, realmente era de naturaleza comercial y, por ello, debía evaluarse conforme a la Sección 4.02 del Reglamento de Procedimientos Adjudicativos de la Junta de Planificación. Los proponentes acogieron dicho planteamiento y le solicitaron a la Junta que evaluara el proyecto propuesto conforme a dicha Sección del Reglamento.

El 13 de septiembre de 2001 las compañías F.W. Mayagüez, S.E., Limited Partnership, S.E., Western Plaza Shopping

Center y K-Mart Corporation solicitaron intervenir. [4] En octubre de 2001, los peticionarios sometieron un análisis de impacto económico del proyecto propuesto, que fue realizado por el economista Ángel L. Ruiz. Junto a dicho estudio, los proponentes presentaron una moción para informar que estaban preparados para ir a vista pública.

Luego de varios incidentes procesales, el 10 de mayo de 2002, la firma de ingenieros y arquitectos encargada del proyecto, SQR Group Corporation, informó a la Junta que la tienda Costco no formaría parte del desarrollo propuesto, debido a que no se pudieron completar las negociaciones con dicha compañía. Sin embargo, **expusieron que la propuesta no variaba en nada ya que tanto el pietaje como la cantidad de estructuras y de estacionamientos eran iguales. El único cambio que informaron fue que el local principal sería utilizado sólo para la venta de artículos al detal y sería operado por el dueño del predio.**

El 17 de septiembre de 2002 la Junta le informó a las partes que el 4 de octubre de 2002 se celebraría una vista sobre la consulta de ubicación. Luego de varios incidentes procesales, la vista se celebró en la fecha indicada y se pautó su continuación para el 31 de octubre de 2002. [5]

---

[4] El 12 de diciembre de 2001 la Junta emitió una Resolución en la que autorizó la intervención solicitada. La firma Investment GP & SR, Inc., por su parte, presentó una moción de intervención el 12 de marzo de 2002. La misma fue declarada con lugar por la Junta el 20 de noviembre de 2002.

[5] El 9 de octubre de 2002 los proponentes le solicitaron a la Junta que les autorizara a publicar nuevamente el aviso de la vista pública a celebrarse el 31 de octubre de 2002. El objetivo de la solicitud era corregir dos errores que se

El 14 de octubre de 2002 los proponentes le solicitaron a la agencia mencionada que, como parte de lo propuesto en la consulta de ubicación, se considerara en la vista pautada para el 31 de octubre de 2002 el cambio de zonificación para el predio, de un distrito R-0 a uno C-2. La intención de los proponentes era que la zonificación fuera cambiada una vez el proyecto estuviera construido, a tenor con la Sección 4.10 del Reglamento de Zonificación de Puerto Rico. La vista referida se celebró el 31 de octubre de 2002, según se había anunciado.

El 20 de noviembre de 2002 el Centro Unido de Detallistas presentó una moción con sus comentarios en torno al análisis de impacto económico presentado por los proponentes. Dichos comentarios fueron preparados por el economista José I. Alameda Lozada.

El 27 de noviembre de 2002 el Centro Unido de Detallistas presentó una moción de desestimación y planteó, entre otras cosas, que no se había presentado una declaración de impacto ambiental ni un estudio hidrológico-hidráulico. Según dicha entidad, éstos eran necesarios para la aprobación del proyecto propuesto debido a que éste colindaba con la reserva natural del caño La Boquilla. El 9 de enero de 2003

---

habían cometido en el aviso de vista pública anterior y que fueron planteados en la vista pública de 4 de octubre de 2002. Los errores cometidos fueron: (1) que se informó que el predio objeto de consulta ubicaba en un Distrito de Zonificación Residencial Uno (R-1), cuando en realidad era R-0; y (2) que se había notificado que el predio objeto de consulta ubicaba en la Carretera Estatal Núm. 341, cuando en realidad era en la Núm. 342. La Junta accedió a lo solicitado.

los proponentes presentaron una oposición a la moción de desestimación referida.

El 26 de septiembre de 2003 la Junta de Planificación aprobó la consulta de ubicación objeto de este caso.[6] Entre otras cosas, la Junta determinó que el predio donde se ubicaría el desarrollo colindaba con el ámbito de expansión urbana del Municipio de Mayagüez y que en el sector existían centros comerciales, negocios aislados, industrias y oficinas gubernamentales. En su Resolución, la Junta resaltó las observaciones de las diversas agencias que comentaron el proyecto.[7] Entre dichas agencias estuvieron el Departamento de Recursos Naturales, la Junta de Calidad Ambiental y el Departamento de Agricultura.

El Departamento de Recursos Naturales endosó el proyecto e indicó que **la evaluación ambiental**, en la que se concluyó que el proyecto no tendría impacto ambiental significativo, **era de su conformidad.** Acto seguido, enumeró una serie de medidas que deberían tomarse para prevenir impactos a los sistemas naturales existentes en el área. La Junta de Calidad Ambiental, en concordancia con lo afirmado por el

---

[6] Dicha determinación fue notificada el 18 de noviembre de 2003.

[7] Las agencias comentadoras del proyecto lo fueron: la Autoridad de Acueductos y Alcantarillados, la Autoridad de Energía Eléctrica, el Departamento de Agricultura, la Autoridad de Carreteras y Transportación, el Instituto de Cultura Puertorriqueña, el Municipio de Mayagüez, el Departamento de Recursos Naturales, el Cuerpo de Ingenieros del Ejército de Estados Unidos, el Servicio de Pesca y Vida Silvestre y Fomento Industrial. Con la excepción del Departamento de Agricultura, todas las agencias estatales dieron su visto bueno al proyecto, sujeto al cumplimiento de diversas recomendaciones.

Departamento de Recursos Naturales, **señaló que la evaluación ambiental presentada cumplió con el requisito de evaluar el impacto ambiental del proyecto propuesto según lo requería el artículo 4(c) de la Ley sobre Política Pública Ambiental**, Ley Núm. 9 de 18 de junio de 1970, 12 L.P.R.A. 1121-1142 (en adelante Ley sobre Política Pública Ambiental o Ley 9).[8]

El Departamento de Agricultura, que fue la única agencia estatal que objetó el desarrollo propuesto, indicó que los suelos del sector donde estaría el proyecto **conservan su potencial agrícola a pesar de que existen comercios en áreas cercanas**. Por ello, concluyó que los predios donde ubicaría el desarrollo debían ser conservados para la industria agrícola del país.

Como parte de sus conclusiones de derecho esbozadas en la resolución, la Junta de Planificación estableció que los proponentes solicitaron la aprobación de la consulta de ubicación y una enmienda al mapa de zonificación para cambiar el distrito de R-0 a C-2. Determinó que aunque el uso propuesto no era de los expresamente autorizados por el Reglamento para un distrito de zonificación R-0, el proyecto podía tramitarse conforme a las disposiciones sobre

---

[8] El 9 de septiembre de 2004 la Asamblea Legislativa de Puerto Rico aprobó la Ley Núm. 416, la cual estableció una nueva Ley Sobre Política Pública Ambiental y derogó la Ley Núm. 9 de 18 de junio de 1970. No obstante, el caso de marras se rige por la Ley Núm. 9 de 18 de junio de 1970, bajo la cual fue tramitada, aprobada y revisada la consulta de ubicación de autos. *Cf.* Artículo 69, Ley sobre Política Pública Ambiental de 2004 (estableciendo que "[t]odo proceso *cuasi* judicial, administrativo, adjudicativo, etc. ya comenzado o pendiente antes de la vigencia de esta Ley se regirán (sic) por las leyes, reglamentos y órdenes aquí derogadas conforme a la ley aplicable al momento de ocurrir aquellos hechos o eventos que provocaron dichos procesos").

desarrollos extensos, las cuales permiten que se consideren proyectos de ese tipo independientemente del distrito de zonificación para el cual se propongan, sujeto al cumplimiento de diversos requisitos que se cumplieron en este caso.

En cuanto a los documentos ambientales, la Junta hizo constar: (1) que los proponentes deberían cumplir con las recomendaciones de las agencias concernidas; y (2) que la evaluación de los mismos se circunscribió a la etapa de construcción de las estructuras y facilidades del proyecto comercial, por lo cual los usos individuales de los locales comerciales que se estableciesen debían ser evaluados posteriormente mediante la preparación de los documentos ambientales correspondientes. Además, advirtió que la aprobación de la consulta no implicaba la aprobación de las etapas subsiguientes, las cuales debían someterse a la Administración de Reglamentos y Permisos.

En lo que respecta a la zonificación del predio donde ubicaría el proyecto, la Junta expresó que el proyecto tendría parámetros de diseño correspondientes a un Distrito de Zonificación de Centros de Mercadeo (C-4).[9] Sin embargo, según surge de la propia Resolución, la enmienda al mapa de zonificación que solicitaron los proponentes era para que el distrito R-0 fuera cambiado a uno C-2, no a uno C-4.

---

[9] Según la Sección 24.00 del Reglamento de Zonificación, el propósito de los distritos C-4 es clasificar los Centros de Mercadeo establecidos conforme a las disposiciones aplicables a los Proyectos de Desarrollos Extensos, establecidas en la Sección 79.00 del Reglamento mencionado. Reglamento de Zonificación, *supra*.

El 8 de diciembre de 2003 la interventora Investment GP & SR, Inc. presentó una moción de reconsideración. Luego de varios incidentes procesales, el 29 de diciembre de 2003 la Junta de Planificación notificó una resolución en la cual reafirmó su aprobación de la consulta de ubicación.

Inconformes con esta decisión, el 28 de enero de 2004 los interventores presentaron dos recursos de revisión separados ante el Tribunal Apelaciones. El 28 de mayo de 2004, después de haber consolidado ambos recursos, el foro apelativo emitió una sentencia mediante la cual revocó la determinación de la Junta de Planificación. Dicha sentencia fue notificada el 4 de junio de 2004.

El Tribunal de Apelaciones resolvió, en primer lugar, que la Junta de Planificación había errado al no ordenarle a los proponentes que presentaran una declaración de impacto ambiental, debido a que en el área cercana al proyecto se encontraba la Reserva Natural caño La Boquilla y existían humedales que podrían ser afectados por el desarrollo.

En segundo lugar, el foro apelativo determinó que, pese a que el proyecto estaría localizado en una zona inundable, los proponentes no habían presentado un estudio hidrológico hidráulico, incumpliendo así con el Reglamento Sobre Zonas Susceptibles a Inundaciones. Aunque en la Resolución de la Junta de Planificación se esbozaron los comentarios del Municipio de Mayagüez, el cual hizo referencia a un estudio hidrológico hidráulico actualizado realizado por el Departamento de Recursos Naturales, el foro apelativo determinó que: (i) en este caso no se había presentado ningún

estudio ni por una agencia ni por los proponentes; y (ii) el estudio, de haberlo, era de 1989 y, por ello, el mismo debía actualizarse para tomar en cuenta el impacto de otros proyectos y desarrollos realizados en el área desde entonces.[10]

En tercer lugar, el Tribunal de Apelaciones resolvió que la Junta de Planificación había errado al aprobar la consulta de ubicación de marras sin tomar en cuenta que el proyecto propuesto no había sido endosado ni por el Cuerpo de Ingenieros del Ejército de Estados Unidos ni por el Municipio de Mayagüez. Para llegar a la conclusión de que dichas entidades no habían aprobado el proyecto, el foro *a quo* descansó en el hecho de que los proponentes no hicieron un estudio para determinar si el Cuerpo de Ingenieros del Ejército de Estados Unidos tenía jurisdicción sobre los terrenos en donde estaría ubicado el desarrollo propuesto. Toda vez que el Cuerpo de Ingenieros había exigido dicho estudio ante la posibilidad de que existieran humedales en el área donde se construiría el proyecto, y que además el Municipio de Mayagüez había condicionado su endoso a la aprobación de dicha agencia federal, el foro apelativo

---

[10] Para fundamentar su conclusión, el Tribunal de Apelaciones hizo referencia a la Resolución 728 del Senado de Puerto Rico, aprobada el 29 de junio de 2001, y a los informes relacionados con ésta, donde se hace referencia a estudios hidrológicos preparados para otros proyectos en el área. En la Exposición de Motivos de dicha Resolución, **el Senado caracterizó al sector El Maní del Barrio Sabanetas de Mayagüez como una de las áreas más afectadas por inundaciones en la Región Oeste de Puerto Rico**. Exposición de Motivos, R. del S. Núm. 728 de 29 de junio de 2001. De cualquier manera, como veremos, la contención de los peticionarios en este caso es que, dadas las condiciones del predio objeto de consulta, no hay que presentar un estudio hidrológico.

concluyó que el desarrollo propuesto no había sido endosado por ninguna de las dos entidades.

En cuarto lugar, el Tribunal determinó que la solicitud de consulta de ubicación de los proponentes no cumplió con el Reglamento de Procedimientos Adjudicativos de la Junta de Planificación, dado que no se describieron en ella con suficiente precisión: los tipos de usos y área neta de venta al por mayor y al detal; características físicas tales como número de estructuras, áreas de pasillos, áreas de almacén y área bruta total de construcción. El foro apelativo entendió que, como el proyecto ya no sería una tienda Costco, los proponentes no podían seguir argumentando que no tenían que incluir las medidas del almacén ya que la tienda y éste estarían en el mismo lugar.

Por último, el Tribunal *a quo* resolvió que la Junta de Planificación incidió al aprobar el proyecto propuesto, que por sus dimensiones constituiría un desarrollo extenso y conllevaría un cambio de zonificación, sin que se cumplieran los requisitos correspondientes. Para sustentar esta conclusión, el foro apelativo resaltó que aunque en el aviso de vista pública se informó que el cambio de zonificación sería de un distrito R-0 a uno C-2, en su Resolución la Junta indicó que el proyecto tendría parámetros de construcción correspondientes a un distrito C-4. Esta inconsistencia en cuanto al cambio anunciado y el que finalmente se aprobó, según el foro apelativo, tuvo el efecto de privar a la ciudadanía de su derecho a una participación efectiva en el proceso, toda vez que al desconocer cuál era exactamente el

cambio de zonificación propuesto, no pudieron preparar su oposición al cambio que fue autorizado finalmente.

El 21 de junio de 2004 los proponentes presentaron una moción de reconsideración. Entre otras cosas, argumentaron que, previo a que el Tribunal emitiera su sentencia, ya la Junta de Planificación había emitido una resolución para enmendar *nunc pro tunc* su dictamen anterior, a los efectos de aclarar que el proyecto aprobado tendría parámetros de diseño correspondientes a un distrito de zonificación C-2, no C-4 como había resuelto originalmente.

El Tribunal de Apelaciones, luego de acoger dicha moción para estudio y de examinar los escritos en oposición a la misma, le proveyó no ha lugar. Indicó que los proponentes no habían presentado la resolución mencionada y que, en cualquier caso, la Junta la había notificado con posterioridad a que el Tribunal de Apelaciones dictara y notificara su sentencia. Afirmó además que el error que se intentaba corregir allí no era uno de naturaleza clerical, y reafirmó que el proceso de consulta de ubicación había sido errado en derecho e irregular. Para el foro apelativo, el hecho de que la Junta no corrigiera su error sobre zonificación hasta que fue notificada la revocación de la consulta de ubicación, militaba en contra de la posición de los proponentes.

De lo resuelto por el Tribunal de Apelaciones recurrieron ante nos los proponentes mediante una petición de *certiorari,* formulando los siguientes señalamientos de error:

1. Erró el Honorable TA al aplicar el Reglamento de Zonificación de 1992, cuando para la fecha en que suscitan los hechos ya estaba vigente el Reglamento de Zonificación de 5 de noviembre de 2000.

2. Erró el Honorable TA al concluir que la JP incidió al aceptar como justificada la rezonificación indirecta del predio en cuestión a través de una consulta de ubicación.

3. Erró el TA al resolver que la asignación por la JP al proyecto de parámetros de construcción comercial (C-4) constituye un error no susceptible de ser corregido.

4. Erró el TA al resolver que al aprobar la consulta la JP erró en derecho y violó la Sección 4.02 de su Reglamento de Procedimientos Adjudicativos.

5. Erró el Honorable TA al concluir que el proyecto objeto de consulta colinda con el caño La Boquilla y que la JP incidió al no preparar una declaración de impacto ambiental (DIA) para la segunda consulta de ubicación en cuestión.

6. Erró el TA al resolver que en este caso era necesario (sic) la preparación de un estudio hidrológico-hidráulico a pesar de que se conoce el nivel de inundación base.

7. Erró el TA al revocar la consulta por falta de un permiso del Cuerpo de Ingenieros de Estados Unidos.

8. Erró el Honorable TA al revocar la Resolución emitida por la JP a pesar de que ésta descansa en evidencia sustancial.

El 9 de noviembre de 2004 los proponentes-peticionarios presentaron ante nos una solicitud para que consolidáramos el caso de epígrafe con Investment G.P.C. & S.R., Berríos Realty, Inc. v. Centro Unido de Detallistas.

El 10 de diciembre de 2004 expedimos el auto solicitado a los fines de revisar la sentencia dictada por el Tribunal de Apelaciones y denegamos la solicitud de consolidación.

El 4 de abril de 2005 la parte peticionaria sometió un alegato en apoyo a su solicitud de certiorari. Los recurridos

F.W. Mayagüez, S.E., Western Plaza Shopping Center, Limited Partnership, S.E. y K-Mart Corporation presentaron su alegato en oposición al *certiorari* el 3 de mayo de 2005. El recurrido Centro Unido de Detallistas presentó su alegato el 10 de mayo de 2005.[11] Estando en posición de resolver procedemos a hacerlo.

## II

Revisión judicial de las decisiones administrativas

Reiteradamente hemos resuelto que las determinaciones de los organismos administrativos especializados merecen gran consideración y respeto. P.C.M.E. v. J.C.A., res. 23 de diciembre de 2005, 166 D.P.R. ___, 2005 TSPR 202, 2006 JTS 7; Misión Ind. P.R. v. J.C.A., 145 D.P.R. 908 (1998). Esta deferencia se fundamenta en la vasta experiencia y el conocimiento especializado que ostentan las agencias acerca de los asuntos que les son encomendados. P.C.M.E. v. J.C.A., supra.

En la revisión de determinaciones administrativas, el criterio rector para los tribunales es la razonabilidad en la actuación de la agencia recurrida. Otero v. Toyota, res. el 3 de febrero de 2005, 163 D.P.R. ____, 2005 TSPR 8, 2005 JTS 13. La Sección 4.5 de la Ley de Procedimiento

---

[11] El 14 de febrero de 2005 la Junta de Planificación nos solicitó que, para efectos de los señalamientos de error tercero, cuarto, quinto y octavo planteados por los peticionarios en su recurso, aceptáramos como su alegato el mismo escrito que había presentado ante el foro apelativo. En cuanto a los señalamientos de error restantes, indicó que le pareció adecuada la discusión que los peticionarios hicieron de los mismos en su escrito de *certiorari*. El 6 de mayo de 2005 declaramos con lugar la moción referida.

Administrativo Uniforme dispone que las determinaciones de hechos de las agencias serán sostenidas si se fundamentan en evidencia sustancial que obre en el expediente administrativo considerado en su totalidad. 3 L.P.R.A. 2175; Misión Ind. P.R. v. J.C.A., supra. Evidencia sustancial, según lo hemos resuelto, es "aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión". Otero v. Toyota, supra en la pág. 685. El propósito principal de la doctrina de evidencia sustancial es "evitar la sustitución del criterio del organismo administrativo en materia especializada por el criterio del Tribunal revisor". P.C.M.E. v. J.C.A., supra (énfasis en el original).

En armonía con lo anterior, hemos señalado que los procedimientos y las decisiones de las agencias administrativas están cobijadas por una presunción de regularidad y corrección. P.C.M.E. v. J.C.A., supra. Por ello, la parte que impugne las determinaciones de hecho de una agencia tiene que demostrar que la evidencia en que se apoyó la misma no es sustancial. Esto es, dicha parte:

> Debe demostrar que existe otra prueba en el expediente que reduzca o menoscabe el valor probatorio de la evidencia impugnada, hasta el punto de que no se pueda concluir que la determinación de la agencia fue razonable de acuerdo con la totalidad de la prueba que tuvo ante su consideración. P.C.M.E. v. J.C.A., supra (énfasis suprimido), citando a Misión Ind. P.R. v. J.P., 146 D.P.R. 64, 131 (1998).

Las conclusiones de derecho de las agencias administrativas, por otra parte, son revisables en su totalidad. 3 L.P.R.A. 2175. No obstante, los tribunales

deben darles gran peso y deferencia a las interpretaciones que la agencia administrativa hace de aquellas leyes particulares que le corresponde poner en vigor, y, por ello, no pueden descartar libremente las conclusiones e interpretaciones de la agencia, sustituyendo el criterio de ésta por el propio. P.C.M.E. v. J.C.A., supra; Mun. De San Juan v. J.C.A., 152 D.P.R. 673 (2000); P.R.T.C. v. J. Reg. Tel. de P.R., 151 D.P.R. 269 (2000). Las agencias, contrario a los tribunales, cuentan con conocimientos altamente especializados acerca de los asuntos que les son encomendados por el legislador. P.C.M.E. v. J.C.A., supra; Rivera v. A & C Development, 144 D.P.R. 450 (1997). Por lo tanto, nuestra revisión se limita a determinar si la interpretación o actuación administrativa fue razonable a la luz de las pautas trazadas por el legislador. Rivera v. A & C Development, *supra*. Si la interpretación de la Ley realizada por la agencia es razonable, aunque no sea la única razonable, **los Tribunales deben darle deferencia**. Por el contrario, los tribunales se abstendrán de avalar o deferir a la interpretación de la agencia si ésta: (1) erró al aplicar la ley; (2) actuó arbitraria, irrazonable o ilegalmente; o (3) lesionó derechos constitucionales fundamentales. P.C.M.E. v. J.C.A., supra. En efecto, **"el Tribunal podrá sustituir el criterio de la agencia por el propio sólo cuando no pueda hallar una base racional para explicar la decisión administrativa."** Otero v. Toyota, *supra*, en la pág. 685 (énfasis suplido).

En resumen, la revisión judicial de las determinaciones administrativas se limita a determinar si la actuación administrativa fue razonable y sólo cede cuando está presente alguna de las siguientes situaciones: (1) cuando la decisión no está basada en evidencia sustancial; (2) cuando el organismo administrativo ha errado en la aplicación de la ley; y (3) cuando ha mediado una actuación ilegal o una decisión carente de una base racional. Otero v. Toyota, *supra* en la pág. 685. Consecuentemente, "el criterio que debemos aplicar no es si la decisión administrativa es la más razonable o la mejor; es, repetimos, si la determinación de la agencia, en [la] interpretación de los reglamentos y las leyes que le incumbe implementar, es una razonable". P.C.M.E. v. J.C.A., *supra* (énfasis en el original).

Debido a todo lo anterior, en casos como el de autos, nuestra función se limita a verificar si las agencias concernidas cumplieron cabalmente con todas sus obligaciones legales y si fundamentaron sus determinaciones. No nos corresponde pasar juicio sobre los méritos sustantivos de la acción propuesta, ni nos corresponde sustituir el criterio de la agencia proponente o de la Junta de Calidad Ambiental sobre dichos méritos. Mun. De San Juan v. J.C.A., supra; P.C.M.E. v. J.C.A., supra.

A la luz de esta normativa general, pasamos a considerar las normas concretas aplicables a los distintos aspectos del caso de autos y a revisar su adjudicación aquí:

Normas aplicables a los cambios de zonificación y a los desarrollos extensos

Según lo hemos establecido anteriormente, la importancia que tiene para el pueblo la utilización adecuada y ordenada de nuestros escasos terrenos y recursos naturales, es un valor reconocido por nuestra Constitución. Ortiz Gómez et al. v. J. Plan., 152 D.P.R. 8, 16 (2000); Art. VI, Secs. 14 y 19, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1999, págs. 418, 421.

En aras de guiar el desarrollo de Puerto Rico de modo coordinado, adecuado y económico, fomentando, entre otras cosas, la eficiencia, la economía y el bienestar en el uso de las tierras y otros recursos naturales, la Asamblea Legislativa aprobó la Ley Orgánica de la Junta de Planificación de Puerto Rico. Art. 4, Ley Núm. 75 de 24 de junio de 1975, 23 L.P.R.A. sec. 62(c); López v. Antonio Roig Sucrs., Inc., res. el 17 de junio de 2002, 157 D.P.R. ____, 2002 TSPR 79, 2002 JTS 85, 1159.

La Junta de Planificación es el organismo facultado por ley para hacer determinaciones sobre usos de terrenos dentro de los límites territoriales del Estado Libre Asociado de Puerto Rico con sujeción a los requisitos consignados en las leyes aplicables. 23 L.P.R.A. sec. 62(j)(14). A la Junta de Planificación, hemos establecido, "se le ha encomendado la ingente labor de velar por la adecuada utilización de nuestros terrenos". Ortiz Gómez et al. v. J. Plan., supra, pág. 16.

Con el propósito de dotar a la Junta con los instrumentos necesarios para que pudiera ejercer esta función

constitucional de guiar y controlar el uso y desarrollo de los terrenos en Puerto Rico, la Legislatura le confirió, entre otras, las siguientes facultades: (1) **adoptar planes de usos de terrenos**, los cuales pueden ser preparados por la propia Junta, por entidades designadas por ésta o por otros organismos gubernamentales; (2) **adoptar y aprobar un Reglamento de Zonificación**; y (3) **adoptar y aprobar los mapas de zonificación y las enmiendas a éstos**, según los procedimientos establecidos por Ley. 23 L.P.R.A. Secs. 62j(4)(5), 62m.

Los planes de usos de terrenos tienen la función de designar la distribución, extensión e intensidad de los usos de los terrenos, sea para propósitos residenciales, agrícolas, industriales, comerciales, de explotación minera o de protección de los recursos naturales, entre otros. 23 L.P.R.A. sec. 62m. Adoptado un Plan de Uso de Terrenos por la Junta y aprobado por el Gobernador, **las obras y proyectos que cualquier entidad o persona desarrolle deberán estar de acuerdo a dicho plan**. 23 L.P.R.A. sec. 62m. Según la Ley de Planificación, "[l]os Planes de Usos de Terrenos, así como la disponibilidad y programación de la infraestructura física social, serán la base para la preparación y revisión de los mapas de zonificación". 23 L.P.R.A. sec. 62m.

La zonificación es el proceso mediante el cual "se clasifican los terrenos en zonas, o distritos y se establecen para cada uno disposiciones específicas sobre el uso de los terrenos y sobre las obras y estructuras a permitirse". Introducción, Reglamento de Zonificación, *supra*. Véanse,

además, Reglamento de Zonificación, *supra*, en la pág. 27; T-JAC, Inc. v. Caguas Centrum Limited, 148 D.P.R. 70, 81-82 (1999). En otras palabras, mediante la zonificación "se establecen las normas esenciales sobre cómo y donde deben ubicarse las múltiples actividades sociales y económicas de Puerto Rico". Introducción, Reglamento de Zonificación, *supra*.

A través de la reglamentación de la zonificación, hemos resuelto, "el Estado asume un rol activo en el proceso de control y regulación de la utilización del limitado recurso de la tierra y de nuestro frágil ecosistema, a fin de armonizar intereses y aspiraciones con las menores perturbaciones sociales". Luan Investment Corp. v. Román, 125 D.P.R. 533, 548 (1990). Los Mapas de Zonificación forman parte integral y rigen conjuntamente con el Reglamento de Zonificación, toda vez que demarcan y definen los diferentes distritos que se describen en el Reglamento. Introducción, Reglamento de Zonificación, *supra*.

En cuanto a las enmiendas a los mapas de zonificación, la Ley de Planificación establece que **las enmiendas que adopte la Junta a los mapas de zonificación adoptados y firmados por el Gobernador no introducirán cambios fundamentales a los mismos, "excepto con el propósito de instrumentar las recomendaciones del Plan de Usos de Terrenos y del Plan de Desarrollo Integral de Puerto Rico hasta donde estos hayan sido aprobados".** 23 L.P.R.A. sec. 63 (énfasis suplido). Esto, pues, "toda obra o proyecto a ser realizado por cualquier persona o entidad deberá estar de acuerdo con

las recomendaciones de los planes de usos de terrenos". López v. Antonio Roig Sucrs., Inc., *supra*, en la pág. 1159; 23 L.P.R.A. sec. 62(m). Coincidentemente, frente a una solicitud de rezonificación, "[n]uestra realidad social obliga al Estado a salvaguardar, [en lo posible], la[s] zonificaciones existentes". Ortiz Gómez *et al*. v. J. Plan., *supra*, pág. 17, citando a Montoto v. Lorie, 145 D.P.R. 30 (1998).

Procesalmente existen dos vías para someter ante la consideración de la Junta de Planificación una solicitud para cambiar la zonificación de un predio. En primer lugar, puede pedirse dicho cambio directamente, sometiendo ante la Junta una solicitud de cambio de zonificación. Sección 4.06 del Reglamento de Zonificación, *supra*; López v. Antonio Roig Sucrs., Inc., *supra*, en la pág. 1161. En segundo lugar, el cambio de zonificación puede ser solicitado de forma indirecta, mediante la presentación de una consulta de ubicación cuya aprobación conllevaría cambiar la zonificación de un predio. Sección 4.09 del Reglamento de Zonificación, *supra*; López v. Antonio Roig Sucrs., Inc., *supra*, en la pág. 1161. En áreas zonificadas, la "*consulta de ubicación*" es el procedimiento mediante el cual la Junta de Planificación pasa juicio sobre propuestos usos de terrenos que no son permitidos ministerialmente por la zonificación aplicable. Sección 2.01 del Reglamento de Zonificación, *supra*.[12]

---

[12] En la Sección 7.01 del Reglamento de Procedimientos Adjudicativos de la Junta de Planificación se establece que al estudiar, tramitar y resolver una consulta de ubicación la Junta tomará en consideración: la Ley Orgánica de la Junta de Planificación, la Ley de Municipios Autónomos, Planes Regionales adoptados por la Junta, los Objetivos y Políticas

Por otro lado, aparte de las normas aplicables a los cambios de zonificación y a las consultas de ubicación, el Reglamento de Zonificación establece unos **requisitos adicionales** con los que deberá cumplir todo proyecto que, por la gran cantidad de terreno que envuelve, sea clasificado como un desarrollo extenso. Están clasificados como desarrollos comerciales extensos **aquellos proyectos que excedan los veinte mil (20,000) pies cuadrados de construcción o que conlleven un cambio de zonificación para terrenos que excedan las cabidas máximas establecida en la Sección 4.05 del Reglamento de Zonificación**. La Sección 4.05 establece, en lo aquí pertinente, que cuando la cabida de un predio exceda de 2,000 metros cuadrados y el cambio de zonificación implicado sea para que dicha propiedad quede zonificada como C-2, deberán cumplirse las reglas aplicables a las consultas de ubicación y a los desarrollos extensos.

Según expresamos en <u>López v. Antonio Roig Sucrs., Inc.</u>, *supra*, al referirnos a disposiciones similares del Reglamento de Zonificación de 1992, "[l]a distinción establecida, dependiendo del tamaño de la propiedad objeto del cambio de zonificación, es de fácil comprensión y obedeció al interés, siempre vigente, de coordinar adecuadamente el desarrollo de

_____

del Plan de Usos de Terrenos de Puerto Rico, los Mapas de Zonificación y de Zonas Susceptibles a Inundaciones, Planes de Usos de Terrenos (incluyendo los mapas de expansión urbana), los Planes de Ordenación Territorial, los usos existentes en el sector, la situación de la infraestructura física y social en el lugar, distancia entre los terrenos y las áreas construidas, la importancia agrícola o ambiental de los terrenos, entre otros. Sección 7.01 del Reglamento de Procedimientos Adjudicativos, Reglamento Núm. 6031, Departamento de Estado, efectivo el 12 de noviembre de 1999.

terrenos en Puerto Rico. Así, el Reglamento de Zonificación manifestaba una inclinación por asegurar que aquellas propiedades o proyectos de envergadura, que involucrasen grandes extensiones de terreno, siguiesen un procedimiento de mayor rigor antes de que se produjera una extensa rezonificación de un área". López v. Antonio Roig Sucrs., *supra*, en la pág. 1160.

En esta línea, la Sección 81.03 del Reglamento de Zonificación establece que en los Desarrollos Comerciales Extensos que evalúe la Junta de Planificación se deberán observar las siguientes normas: "(1) la cabida del predio excederá el máximo permitido como cambio de zonificación y cada estructura ubicará en un solar con tamaño suficiente para proveer el estacionamiento requerido; (2) **el proyecto estará conforme con las recomendaciones del Plan de Usos de Terrenos vigente**; (3) si la infraestructura necesaria para atender las necesidades del proyecto propuesto y para mitigar sus efectos directos e indirectos está disponible o puede proveerse; (4) se celebrará vista pública con notificación a los dueños de las propiedades en un radio de cien (100) metros del área en que se propone el proyecto, medidos tomando los puntos más cercanos entre dicha área y cada una las referidas propiedades". Sección 81.03, Reglamento de Zonificación, *supra*, pág. 282-83 (énfasis suplido).

En López v. Antonio Roig Sucrs., Inc., *supra*, y en T-JAC, Inc. v. Caguas Centrum Limited, *supra*, tuvimos la oportunidad de expresarnos en cuanto a la interrelación entre las figuras de la consulta de ubicación, los desarrollos

extensos y la rezonificación, interpretando las disposiciones del Reglamento de Zonificación de 1992. En López v. Antonio Roig Sucrs., Inc., *supra*, reafirmamos y ampliamos lo expresado en T-JAC, Inc. v. Caguas Centrum Limited, *supra*, y establecimos que, evidentemente, **todo proyecto que conllevara un cambio de zonificación debería cumplir con las normas sobre rezonificación, independientemente de si el cambio de zonificación era uno que se trataba de obtener de forma directa (presentando una solicitud de cambio de zonificación propiamente dicha), o de forma indirecta (presentando una solicitud de consulta de ubicación para un proyecto que, de ser aprobado, conllevaría un cambio de zonificación).** Análogamente, si un proyecto constituye también un desarrollo extenso, debe cumplir con las normas aplicables a dichos proyectos, y con las de cambio de zonificación y las de cualquier otra figura aplicable. López v. Antonio Roig Sucrs., Inc., *supra*; T-JAC, Inc. v. Caguas Centrum Limited, *supra*.

Así, en dichas decisiones indicamos que, aunque la Junta tuviera discreción para considerar las consultas de ubicación, dicho vehículo procesal no era un cheque en blanco. **"La Junta no puede ampararse en la figura de la consulta de ubicación [o en la de los desarrollos extensos] para valerse de un eximente que le permita obviar los procedimientos establecidos por dicha agencia o, más aún, por la Ley de Planificación. De otro modo, de poco servirían los requisitos legales establecidos para cada figura si la Junta, a su antojo, dispusiere de un mecanismo que le permitiera**

**autorizar proyectos indiscriminadamente"**. López v. Antonio Roig Sucrs., Inc., *supra*, en las págs. 1161 (énfasis suplido).

Mediante los señalamientos de error primero, segundo y octavo la parte peticionaria argumentó, en esencia, que había errado el Tribunal de Apelaciones, entre otras cosas, al resolver: (a) que en el trámite de la consulta objeto de este recurso no se cumplieron las disposiciones reglamentarias aplicables a los cambios de zonificación mediante consulta de ubicación y a los desarrollos extensos, a tenor con las disposiciones del Reglamento de Zonificación del año 2000; y (b) que no hubo evidencia sustancial para aprobar la consulta de ubicación aquí en controversia.

En el caso de autos, los proponentes peticionarios acudieron a la Junta de Planificación para que les autorizara a construir un proyecto de carácter comercial (C-2), en un predio con una zonificación de tipo residencial (R-0). Debido a que dicho proyecto propone usos de terrenos que no son permitidos ministerialmente por la zonificación aplicable al predio, utilizaron el vehículo procesal de la consulta de ubicación. Surge de lo anterior que la aprobación de la consulta de ubicación presentada por los proponentes conllevaría un cambio en la zonificación del predio toda vez que se autorizaría la construcción de un edificio comercial en un área con una zonificación residencial.

La Sección 4.06 del Reglamento de Zonificación del año 2000 establece que la Junta podrá considerar un cambio de zonificación siempre que la entidad peticionaria: (1) llene todas las partes de los formularios correspondientes; (2) notifique su intención de radicar la solicitud de cambio de zonificación a los dueños de las propiedades que radiquen a una distancia de sesenta (60) metros del área cuya rezonificación se propone;[13] (3) incluya un plano de localización del área objeto de petición; (4) ilustre la propiedad en el Mapa de Catastro; (5) **prepare un memorial explicativo con una descripción clara y completa del sector, su localización, sus características sobresalientes, importancia agrícola, histórica, escénica, cultural o natural, las razones que apoyan la solicitud del cambio de zonificación y justificación del beneficio que derivaría la comunidad o el sector con respecto al mismo**; y (6) cualquier otro requisito exigido por la Junta. Sección 4.06, Reglamento de Zonificación, *supra*.

No obstante lo dispuesto en la Sección 4.06, en el caso de autos el peticionario argumentó que la Junta de Planificación podía autorizar un cambio de zonificación sin que el solicitante tuviese que cumplir con lo establecido en

---

[13] La distancia de sesenta metros será medida desde los límites de la propiedad objeto de la petición. En caso de que a menos que no existan veinte propiedades dentro del área indicada, el área se ampliará uniformemente en todas las direcciones y se notificará a todos los propietarios que residan dentro del área ampliada.

dicha sección, al amparo de lo dispuesto en las Secciones 4.09 y 4.10 del Reglamento de Zonificación del año 2000.[14]

_____

[14] Dichas disposiciones, que fueron incorporadas al Reglamento de Zonificación en su revisión del año 2000, establecen que:

4.9 La Junta [de Planificación], podrá. . . discutir y considerar cambios de zonificación, mediante el mecanismo de consulta de ubicación . . . para lo cual la Junta celebrará vista pública cumpliendo únicamente con lo dispuesto a continuación:

1. Radicar de conformidad con la reglamentación vigente una consulta de ubicación,

2. Radicar los documentos que a continuación se indican cuando la Junta los solicite:

a. Lista de direcciones postales de:

1) Todos los dueños de propiedades que radican dentro de una distancia de cien (100) metros, medidos desde todos los límites del solar o parcela objeto de la consulta hasta los límites de cualquier solar o parcela que radique dentro de la distancia antes indicada.

2) Si dentro de la distancia de cien (100) metros, indicada en el apartado (a) anterior, no existieren veinte (20) propiedades, deberá ampliar la distancia de los cien (100) metros, en todas direcciones, hasta incluir un mínimo de veinte (20) propiedades. No obstante, deberá incluir todas las propiedades que existan dentro de la distancia ampliada determinada.

d. [sic] Identificar, en un plano, las propiedades incluidas en el listado con el número correspondiente al mismo y marcar la distancia de cien (100) metros ó la distancia ampliada determinada.

e. [sic] Certificar que las direcciones postales que se indican en el listado son correctas, mediante declaración jurada.

f. [sic] Dos (2) copias del croquis que muestre la localización del proyecto en hojas con dimensiones de 8" x 14", si posible, reproducidos del Mapa

Acoger la interpretación que la parte peticionaria propone de las disposiciones transcritas, esto es, que la utilización del mecanismo de la consulta de ubicación deroga los requisitos aplicables a los cambios de zonificación en general, equivaldría no sólo a apartarnos de nuestros pronunciamientos en López v. Antonio Roig Sucrs., *supra*, y en T-JAC, Inc. v. Caguas Centrum Limited, *supra*, sino también a establecer que la Junta de Planificación puede conceder un cambio de zonificación sin que la parte proponente presente, entre otras cosas, un documento con una descripción clara y completa de las razones que apoyan la solicitud de cambio de

---

Cuadrangular topográfico a escala 1:20,000, debidamente identificadas con el número de la consulta.

g. [sic] Nueve (9) copias del plano mostrando la representación gráfica de la propuesta en hojas con tamaño de 24'x 36' aproximadamente.

h. [sic] Deberá incluir dos (2) sobres predirigidos con sellos a cada entidad o propietario que aparezca en el listado de notificaciones, incluyendo las agencias y demás partes con interés (los sobres no deberán tener logo alguno).

4.10 Autorizaciones de Cambio de Zonificación mediante Consulta de Ubicación – Cuando se trate de un uso previamente autorizado por la Junta para el cual se hubiere celebrado vista pública, notificado de la intención de cambiar el distrito de zonificación y expedido el permiso de uso, la parte interesada podrá iniciar el procedimiento de cambio en el mapa de zonificación sometiendo una copia del permiso de uso certificado y autorizado por la Administración de Reglamentos y Permisos como evidencia de que el mismo se construyó y se autorizó su uso conforme a las disposiciones de la consulta. Cuando se verifique que la consulta se culminó, la Junta podrá enmendar el mapa sin necesidad de nueva vista. Secciones 4.09-4.10 del Reglamento de Zonificación, supra, págs. 50-52.

zonificación y la justificación del beneficio que derivaría la comunidad o el sector con respecto al mismo.

Para resolver la controversia ante nosotros, sin embargo, no tenemos que resolver lo anterior. Según surge del expediente en el caso de autos, los proponentes observaron las normas de la Regla 4.09, incluyendo lo respectivo a la notificación del cambio de zonificación propuesto a los vecinos del sector donde estaría ubicado el proyecto. Dichas normas de notificación, aunque no son idénticas a las de la Regla 4.06, también contemplan la notificación a los dueños de las veinte propiedades más cercanas al predio. Aparte de lo anterior, los proponentes también cumplieron con todas las normas aplicables a los cambios de zonificación esbozadas en la Regla 4.06. Así, aparte de presentar los documentos allí requeridos, el proponente dio cumplimiento al requisito de presentar un memorial explicativo con las razones que apoyan la solicitud de cambio de zonificación y la justificación del beneficio que derivaría la comunidad o el sector con respecto al mismo.

En el memorial explicativo presentado se expone que, a pesar de que el terreno donde se construiría el proyecto está zonificado R-0, el sector que lo circunda exhibe un comportamiento urbano y en él se han aprobado varios proyectos comerciales e industriales. Se hace hincapié en que el área cuenta con toda la infraestructura básica necesaria para operar el proyecto y que todas las agencias concernidas con infraestructura lo aprobaron.

En cuanto al beneficio que derivaría la comunidad, se afirmó que con el proyecto se procura satisfacer las necesidades de varios vecindarios o núcleos residenciales en la región y se crearán nuevas alternativas de servicios y nuevas fuentes de empleo. Además, se celebraron vistas públicas para considerar dicho cambio de zonificación y se publicó el aviso correspondiente en la prensa. La parte recurrida argumentó que hubo un error en uno de los avisos sobre vista pública. El error consistió en que se notificó que el cambio de zonificación sería de un distrito R-1 a uno C-2, cuando en realidad el predio estaba zonificado R-0. Aun si se considerara, como argumentaron los recurridos, que tal error conllevaría de suyo la invalidez de los procedimientos, surge de los hechos de este caso y del expediente ante nos, y así lo determinó incluso el Tribunal de Apelaciones, que la omisión referida fue corregida por los proponentes quienes notificaron y publicaron un aviso de vista pública enmendado. Así, **los proponentes cumplieron esencialmente con todos los requisitos <u>reglamentarios</u> aplicables a los cambios de zonificación.**

Por otro lado, debido a que el predio de terreno cuya zonificación cambiaría a C-2 tiene una cabida que excede los 2000 metros cuadrados, y a que las facilidades comerciales a construirse excederán los 20 mil pies cuadrados de construcción, deben cumplirse además las reglas aplicables a los desarrollos extensos. Secciones 2.00, 81.03, Reglamento de Zonificación, *supra*. Sobre este punto, la Junta de Planificación, después de citar cada uno de los requisitos

aplicables a los desarrollos extensos, resolvió que la consulta de autos cumplió con los mismos.

Entre los requisitos aplicables a los desarrollos comerciales extensos el reglamento de zonificación establece que **"el proyecto estará conforme con las recomendaciones del Plan de Usos de Terrenos vigente"**. Sección 81.03(2), Reglamento de Zonificación, *supra,* (énfasis suplido).[15] **Este requisito no fue cumplido.**

En cuanto al cumplimiento de los proponentes con estos mandatos estatutarios y reglamentarios de que el proyecto a ser autorizado esté conforme con el plan de usos de terrenos vigente, la Junta indicó que el Plan de Ordenación Territorial del Municipio de Mayagüez se encuentra en su fase final y que, según la parte peticionaria, el desarrollo sería consistente con dicho plan toda vez que según el mismo, los terrenos objeto de consulta pasarían a ser parte del área urbana con una clasificación comercial (CO-3), y están localizados en una área circundada por desarrollo urbano. Dicha clasificación estaría diseñada para clasificar áreas

---

[15] Dicho requisito es consistente con el mandato de la Ley de Planificación que establece que "toda obra o proyecto a ser realizado por cualquier persona o entidad **deberá estar de acuerdo con las recomendaciones de los planes de usos de terrenos, una vez adoptadas por la Junta de Planificación y por el Gobernador**". 23 L.P.R.A. sec. 62(m) (énfasis suplido); López v. Antonio Roig Sucrs., Inc., *supra*, en la pág. 1159. En cuanto a los cambios de zonificación, como indicamos antes, la Ley de Planificación requiere, además de los requisitos reglamentarios, que las enmiendas que adopte la Junta a los mapas de zonificación adoptados y firmados por el Gobernador **no introduzcan cambios fundamentales a los mismos, "excepto con el propósito de instrumentar las recomendaciones del Plan de Usos de Terrenos y del Plan de Desarrollo Integral de Puerto Rico hasta donde estos hayan sido aprobados"**. 23 L.P.R.A. sec. 63 (énfasis suplido).

comerciales existentes o para crear nuevas áreas que suplan las necesidades de varios núcleos residenciales.

En concordancia con lo anterior, se hizo hincapié en que el predio en cuestión colinda con el ámbito de expansión urbana del Municipio de Mayagüez y que entre las políticas de la propuesta de Plan de Ordenación Territorial de dicho pueblo se encuentra el integrar nuevos desarrollos dando énfasis a la continuidad del trazado vial. Según la Junta, que acogió el planteamiento de los proponentes a este respecto, el proyecto propuesto cumple con dichos planes ya que el terreno estaría ubicado en terrenos vacantes circundados por desarrollo urbano.

La parte recurrida, por el contrario, argumentó que toda vez que al momento de ser aprobado el proyecto de autos todavía el Plan de Ordenamiento Territorial del Municipio de Mayagüez no estaba vigente, la Junta erró al aprobar el proyecto de autos sin analizarlo a base de de los "Objetivos y Políticas Públicas del Plan de Usos de Terrenos de Puerto Rico", Reglamento Núm. 5414, Departamento de Estado, efectivo el 31 de octubre de 1995, 23 R.P.R. sec. 650.821-650.862, documento el cual sí estaba vigente. **Tiene razón la parte recurrida.**

El documento "Objetivos y Políticas Públicas del Plan de Usos de Terrenos de Puerto Rico", el cual la Junta ha descrito como "un documento fundamental de planificación",[16] **pero al que no hizo referencia en su dictamen en este caso,** "establece como política pública la intensificación de los

---

[16] Misión Ind. P.R. v. J.P., 146 D.P.R. 64, 166 (1998).

usos comerciales y de servicios, tanto públicos como privados, teniendo como criterio, entre otros, **requerir que los proyectos comerciales y de servicios se ubiquen en terrenos identificados y destinados para usos comerciales y de servicio**". T-JAC v. Caguas Centrum Limited, *supra*, pág. 82 (énfasis suplido). Véanse, además, 23 R.P.R. sec. 650.824(2).

Dicho documento establece expresamente que entre sus objetivos está: **desarrollar actividad agrícola en todos aquellos terrenos que**, como el envuelto en este caso, **tengan potencial para dicho uso**; retener exclusivamente para usos agrícolas aquellos terrenos de alta productividad agrícola; y señalar para propósitos urbanos, como primera prioridad, aquellos terrenos que no sean de alta productividad agrícola. 23 R.P.R. sec. 650.823(b), 650.830, 650.833(1).

En el caso de autos, al no existir ni un plan de usos de terrenos ni un plan de ordenación territorial vigentes para el área específica en que estaría ubicado el proyecto, la **Junta no podía soslayar un documento que sí estaba en vigor**, que fue adoptado por ella misma en el 1995, y que fue aprobado por el entonces Gobernador de Puerto Rico, para que fuera un "documento rector de política pública" que aplicara a los usos de terrenos en todo Puerto Rico. Como hemos señalado, tal análisis de consistencia es requerido por el ordenamiento. 23 L.P.R.A. secs. 62(m), 63; Sección 81.03(2), Reglamento de Zonificación, *supra*. Dicho análisis es especialmente importante en un caso como el de marras en que se pretende ubicar un proyecto comercial en terrenos con potencial agrícola, debido a que tanto la zonificación como

el documento rector sobre usos de terrenos vigentes tutelan y protegen tal atributo del terreno. La Junta erró al no examinar lo anterior y determinar si a pesar de ello el proyecto propuesto encajaba con alguno de los Objetivos y Políticas Públicas del Plan de Usos de Terrenos. Por ello, procede que se devuelva el caso a dicha agencia para que cumpla con lo anterior.

Si bien la Junta de Planificación es el organismo con la facultad en ley para hacer determinaciones sobre usos de terrenos dentro de los límites territoriales del Estado Libre Asociado de Puerto Rico, cualquiera que sean esos usos, **no puede hacerlo a espaldas de sus propias leyes y reglamentos**. Según hemos establecido, "una vez la agencia adopta una norma administrativa, debe cumplirla y aplicarla en la manera en que está concebida, sirviendo siempre a los propósitos, objetivos y política pública que la forjaron". Torres v. Junta de Ingenieros, res. el , 161 D.P.R. ____, 2004 TSPR 65, 2004 JTS 71. Véase, además, T-JAC, Inc. v. Caguas Centrum Limited, *supra*.

B.    La Sección 4.02 del Reglamento de Procedimientos Adjudicativos

En el Reglamento de Procedimientos Adjudicativos de la Junta de Planificación se establecen el proceso que se debe seguir y los elementos de juicio que la Junta debe considerar al evaluar las consultas de ubicación. Véanse Reglamento de Procedimientos Adjudicativos de la Junta de Planificación, Reglamento Núm. 6031, Departamento de Estado, efectivo el 12

de noviembre de 1999; Rivera v. Morales, 149 D.P.R. 672 (1999).

En los incisos (1), (2) y (5) de la Sección 4.02 de dicho Reglamento se indica, en lo pertinente, que en toda solicitud de consulta de ubicación para un proyecto comercial se debe incluir la siguiente información:

(i) categoría del proyecto propuesto atendiendo al área neta de ventas y de almacén. Por ejemplo, aquellos proyectos con un área neta de ventas y de almacén de entre 100,000 y 249,999 pies cuadrados son de categoría sub-regional;

(ii) una descripción del proyecto donde se indiquen los tipos de usos y el área neta de venta de cada tipo, características físicas tales como número de estructuras, áreas de pasillos, áreas de almacén y área bruta total de construcción;

(iii) enmarcar el proyecto en el contexto de la actividad comercial existente y aprobada en el área de mercado, incluyendo datos tales como la saturación del mercado, la oferta de servicios en el área dentro del renglón correspondiente y los comercios existentes en los cascos tradicionales adyacentes y las avenidas comerciales principales. Deberá tomarse en consideración también: el impacto positivo o adverso que el proyecto traerá al área objeto de consulta en términos comerciales o generales; las condiciones socioeconómicas prevalecientes tales como el ingreso per cápita, el

desempleo y cualquier otra información relevante a la viabilidad del proyecto. Estos análisis deben hacerse a la luz de la categoría del proyecto y de las condiciones socioeconómicas en la región. Véanse incisos (1), (2) y (5) de la Sección 4.02 del Reglamento de Procedimientos Adjudicativos de la Junta de Planificación, *supra*.

En el dictamen recurrido, el Tribunal de Apelaciones concluyó que los proponentes incumplieron con la referida Sección 4.02 porque no incluyeron en su solicitud una descripción completa del proyecto. Específicamente, indicó que al cambiar el proyecto y no incluir una tienda Costco, no era válida la defensa de los proponentes en cuanto que el área de venta y almacén estaría en el mismo lugar y que, por ello, el área neta de construcción y de venta era la misma. Mediante su cuarto señalamiento de error los peticionarios plantearon que había errado el foro apelativo al revocar la determinación de la Junta de Planificación sobre este asunto.

Según se desprende del memorial explicativo presentado por los proponentes y de la Resolución de la Junta de Planificación, el proyecto propuesto consistía de la construcción de un edificio de bloques y acero estructural de 136,791 pies cuadrados. Dicha estructura se utilizaría para la venta de artículos del hogar, ferretería liviana y accesorios para automóviles. Además, se construirían tres edificios de 3,500 pies cuadrados cada uno para restaurantes de comida rápida y un edificio de 6,000 pies cuadrados para una sucursal bancaria, para un total de 153,291 pies

cuadrados. En el plano del proyecto sometido por los proponentes se mostraba la distribución de los solares de cada edificio, las aceras y los estacionamientos en el predio.

Dicho proyecto se clasificaba como uno de categoría sub-regional porque contaría con un área neta de ventas de entre 100,000 y 249,000 pies cuadrados. En relación con lo anterior, los peticionarios han hecho constar que el área neta de ventas y el área neta de construcción era la misma debido a que el diseño de los comercios contempla que las áreas de venta y de almacenaje sean en el mismo lugar. Originalmente, el establecimiento destinado para venta de ferretería liviana sería una tienda Costco. Luego, aunque no se completaron las negociaciones con dicha compañía, los proponentes informaron que el proyecto seguiría teniendo el mismo concepto, esto es, con área de venta y de almacén en el mismo lugar. **Lo único que cambiaría era que el negocio sería operado por el dueño de la propiedad, manteniéndose el resto de la propuesta inalterada.**

Examinada la información referida, la Junta estimó que la misma cumplía con el requisito de describir el proyecto, a la luz de lo establecido en la Sección 4.02 de su Reglamento de Procedimientos Adjudicativos. Dicha determinación de la Junta en torno al cumplimiento de los proponentes con un Reglamento que ella administra merece la mayor deferencia y respeto por parte de los tribunales. Ciertamente, según surge de lo expuesto hasta aquí, dicha determinación es razonable

y, por ello, debió ser confirmada por el foro apelativo. El error señalado, pues, fue cometido.

Por otro lado, la parte recurrida Centro Unido de Detallistas argumentó en su alegato, como hiciera en su recurso de revisión ante el Tribunal de Apelaciones, que el estudio de impacto económico presentado por los proponentes era defectuoso y, por lo tanto, incumplía con los parámetros fijados en la Sección 4.02(5) del Reglamento de Procedimientos Adjudicativos. Específicamente, argumentaron que en el estudio sometido no se discutió el efecto del proyecto en: la saturación del mercado, la oferta de servicios similares y en los comercios existentes en los cascos tradicionales y avenidas comerciales principales. No obstante, en el estudio de impacto económico presentado por el perito de la parte proponente, al cual la Junta de Planificación le dio credibilidad, **se concluyó**, después de analizar la economía del Municipio y la región incluyendo las proyecciones de aumento en la demanda de ventas al detal, **que el proyecto propuesto no implicaría impacto negativo alguno para los negocios establecidos en el Municipio o en la Región.** La parte recurrida, sin embargo, amparada en el análisis económico de su propio perito, alegó que el estudio sometido por el perito de los proponentes contenía datos erróneos.

Según hemos establecido anteriormente, en casos donde están envueltas opiniones científicas conflictivas, es a la agencia con el *expertise* sobre la materia a quien le corresponde dirimir los conflictos en peritaje de carácter

científico. <u>Misión Ind. P.R. v. J.C.A.</u>, *supra*, en la pág. 940. Decidir cuáles peritos tienen la razón, tratándose de una materia altamente especializada, rebasa el ámbito propio de la revisión judicial. <u>Misión Ind. P.R. v. J.C.A.</u>, *supra*, en la pág. 940.

Del expediente ante nosotros surge que al determinar que la parte proponente cumplió con el inciso (5) de la Sección 4.02 de su Reglamento de Procedimientos Adjudicativos, la Junta de Planificación tuvo ante su consideración evidencia pericial con conclusiones opuestas. El economista que fungió como perito de los demandantes, doctor Ángel L. Ruiz, preparó un análisis del impacto económico del proyecto. En dicho estudio, como dijimos, **se concluyó que el proyecto propuesto no implicaría impacto negativo alguno para los negocios establecidos en el Municipio o en la Región.**

Por el contrario, el perito economista del recurrido Centro Unido de Detallistas, doctor José I. Alameda Lozada, concluyó que la entrada en el mercado del proyecto propuesto tendría el efecto de quebrar varios de los negocios existentes, toda vez que el nivel de demanda insatisfecho en la región no era suficiente para absorber la nueva empresa. Para sustentar su análisis argumentó esencialmente que en el estudio del perito de los proponentes: (1) se presentaron cifras de ventas anuales inconsistentes para el proyecto propuesto; (2) sólo se hicieron proyecciones del aumento en ventas de los negocios existentes, no del aumento en demanda insatisfecha; (3) en las proyecciones no se tomó en cuenta el impacto económico de una tienda Sam's que comenzaría a operar

en el año 1999; (4) no se detallaron las ventas indirectas o inducidas que generaría el proyecto.

En respuesta a estos señalamientos el perito de los proponentes presentó un escrito ante la Junta de Planificación en el cual argumentó que: (1) para calcular las cifras de ventas del proyecto se utilizaron metodologías diversas las cuales arrojaron resultados distintos; (2) las proyecciones realizadas incluían las ventas indirectas y el aumento en demanda, y aún utilizando la metodología más conservadora para proyectar la demanda el proyecto resultaba viable; (3) el crecimiento del mercado es suficiente para absorber el proyecto propuesto incluso con la tienda Sam's.

Evaluados los argumentos de ambos peritos, la Junta de Planificación le otorgó mayor peso a los presentados por el perito de la parte proponente. Tal dictamen de dicha agencia especializada, al estar apoyado por evidencia sustancial que lo hacía razonable, debió ser respetado por el foro apelativo. Decidir cuál de los peritos tiene la razón, tratándose de una materia altamente especializada, rebasa el ámbito propio de la revisión judicial. Misión Ind. P.R. v. J.C.A., *supra*, en la pág. 940. Al sustituir el criterio de la agencia por el suyo, el foro apelativo extralimitó el ámbito de su revisión. El cuarto error señalado fue cometido.

Por otro lado, la parte recurrida argumentó también que los avisos de vista pública de la Junta de Planificación eran defectuosos porque en ellos no se indicó que la consulta de ubicación debía justificarse a base de las disposiciones del Reglamento de Procedimientos Adjudicativos, ni se mencionó la

citada Sección 4.02(5) de dicho Reglamento sobre análisis de impacto económico. No citó la parte recurrida disposición reglamentaria alguna que amparase su reclamo.

Por el contrario, tanto la Junta de Planificación como el Tribunal de Apelaciones indicaron que los avisos publicados cumplieron con lo dispuesto en la Sección 8.01 del Reglamento de Procedimientos Adjudicativos, *supra*, que regula la notificación de las vistas públicas.[17] Dicha conclusión está

---

[17] Dicha disposición establece lo siguiente:

La Junta, notificará por escrito a todas las partes o a sus representantes autorizados e interventores, la fecha, hora y lugar en que se celebrará la vista adjudicativa. La notificación se deberá efectuar por correo o personalmente con no menos de quince (15) días de anticipación a la fecha de la vista, excepto que por causa debidamente justificada, consignada en la notificación, sea necesario acortar dicho período. Las notificaciones contendrán la siguiente información:

1. Fecha, hora y lugar en que se celebrará la vista, así como su naturaleza y propósito.

2. Advertencia de que las partes, podrán comparecer asistidas de abogados, pero no estarán obligadas a estar así representadas, incluyendo los casos de corporaciones y sociedades.

3. Cita de la disposición legal o reglamentaria que autoriza la celebración de vista.

4. Referencia a las disposiciones legales o reglamentadas presuntamente infringidas, si se imputa una infracción a las mismas, y a los hechos constitutivos de tal infracción.

5. Apercibimiento de las medidas que la agencia podrá tomar si una parte no comparece a la vista.

6. Advertencia de que la vista no podrá ser suspendida.

Si se tratare de una vista pública, la Junta publicará un aviso de prensa en un periódico de

sostenida por el expediente. En los avisos publicados se indican, entre otras cosas, la fecha, hora y lugar de la vista; que la vista se celebraba al amparo de lo dispuesto por la Ley de Planificación, el propósito de la consulta, la descripción del proyecto, la zonificación del predio y el cambio solicitado; que la propuesta debía discutirse, entre otros, a base de los Objetivos y Políticas Públicas del Plan de Usos de Terrenos; que se podía comparecer representado por abogado y que para solicitar la suspensión de la vista había que seguir las normas de la Sección 8.03 del Reglamento de Procedimientos Adjudicativos, *supra*. En consecuencia, tampoco tiene razón la parte recurrida al plantear que no se cumplieron las normas sobre notificación de la vista.

C.   Evaluación del impacto ambiental y obligación de presentar una DIA

La Ley sobre Política Pública Ambiental se creó en consonancia con el mandato constitucional de conservar los recursos naturales. Mun. de San Juan v. J.C.A., *supra*. Según el Artículo 4(c) de dicha Ley, todos los departamentos, agencias, corporaciones públicas, municipios e instrumentalidades del Estado Libre Asociado, **antes de efectuar cualquier acción o promulgar cualquier decisión que afecte significativamente la calidad del medioambiente**, están obligados a realizar una declaración escrita y detallada

circulación general en Puerto Rico, con no menos de quince (15) días de antelación a la fecha de la vista. Sección 8.01, Reglamento de Procedimientos Adjudicativos, *supra*.

sobre el impacto ambiental de la acción propuesta o la decisión a promulgarse. 12 L.P.R.A. sec. 1124(c); P.C.M.E. v. J.C.A., *supra*.

La frase 'cualquier acción', hemos resuelto, "refleja la intención del legislador de abarcar un sinnúmero de actuaciones que llevan a cabo las agencias que pueden causar un impacto sobre el ambiente". Fed. Pesc. Playa Picúas v. J.P., 148 D.P.R. 406, 413 (1999). Para efectos de la Ley 9, el término 'acción' incluye pero no se limita a las siguientes actividades:

> [La] expedición de licencias, concesiones o permisos, adopción de reglamentos o normas, asignación o liberación de fondos, o cambios sustanciales en la política pública de las agencias y sus programas; para aprobar proyectos a través de permisos o cualquier otra decisión reguladora, de zonificación o rezonificación de áreas y propuestas de legislación". Regla 203, Reglamento para el Proceso de Presentación, Evaluación y Trámite de Documentos Ambientales, Reglamento de la Junta de Calidad Ambiental, Reglamento Núm. 6510, Departamento de Estado, efectivo el 20 de septiembre de 2002 (en adelante Reglamento sobre Documentos Ambientales).

En cuanto al término "impacto ambiental significativo", el mismo ha sido definido como:

> El efecto substancial de una acción propuesta sobre uno o varios elementos del ambiente, tales como, pero sin limitarse a: una población biótica, un recurso natural, el ambiente estético o cultural, la calidad de vida, la salud pública, los recursos renovables o no renovables; o que pueda sacrificar los usos beneficiosos del ambiente a largo plazo en favor de los usos a corto plazo o viceversa. Cada uno de los elementos aquí enumerados será evaluado independientemente y en conjunto. Regla 203, Reglamento sobre Documentos Ambientales, *supra*.

La Junta de Calidad Ambiental, organismo creado por la Ley de Política Pública Ambiental, es la entidad a la cual le corresponde examinar la declaración sometida por la agencia proponente[18] y verificar que se hayan cumplido los requisitos sustantivos y procesales impuestos por dicha ley. Mun. De Loíza v. Sucns. Suárez *et al*, 154 D.P.R. 315 (2001). En otras palabras, su papel es custodiar la política ambiental y **fiscalizar** los procedimientos. Regla 212, Reglamento sobre Documentos Ambientales, *supra*.

En aras de detallar el proceso necesario para dar cumplimiento a lo establecido en el artículo 4(c) de la Ley de Política Pública Ambiental, la Junta de Calidad Ambiental aprobó el Reglamento para el Proceso de Presentación, Evaluación y Trámite de Documentos Ambientales. En primer término, la agencia que proponga **cualquier acción** de las cubiertas por la Ley 9 que pudiera tener **algún impacto sobre el ambiente** deberá presentar una **Evaluación Ambiental** de dicha acción ante la Junta de Calidad Ambiental y cualquiera otra agencia que estime pertinente. Reglas 202(B), 203, 241(A), 243, Reglamento sobre Documentos Ambientales, *supra*.[19] **El propósito de dicho documento es que la Junta de**

---

[18] Se denomina "agencia proponente" a aquella instrumentalidad del Estado Libre Asociado de Puerto Rico que se propone llevar a cabo cualquier acción para la que se requiere un documento ambiental o que asume la responsabilidad de cumplir con lo requerido en el Artículo 4 de la Ley Sobre Política Pública Ambiental, según enmendada. Reglamento sobre Documentos Ambientales, *supra*.

[19] El término **"impacto ambiental"** se define como: "[l]os efectos directos, indirectos y/o acumulativos de una acción propuesta sobre el ambiente, incluyendo factores o condiciones tales como: usos del terreno, aire, agua,

**Calidad Ambiental lo examine y determine si dicha acción tendría o no un impacto ambiental significativo**. Regla 202, Reglamento sobre Documentos Ambientales, *supra*.[20]

**Si después de examinar la Evaluación Ambiental sometida la Junta determina que la acción propuesta no tendrá un impacto ambiental significativo**, dicha agencia dará por cumplido el proceso de evaluación ambiental del proyecto, **sin que sea necesario presentar una declaración de impacto ambiental**. Regla 243(c), Reglamento sobre Documentos Ambientales, *supra*. Por otro lado, si la Junta determina que la acción propuesta tendrá un impacto ambiental significativo sobre la calidad del medio ambiente, **entonces** le requerirá a la agencia proponente que prepare una declaración de impacto ambiental para así cumplir con el referido artículo 4(c) de la Ley de Política Pública Ambiental.[21] La agencia proponente

---

minerales, flora, fauna, ruido, objetos o áreas de valor histórico, arqueológico o estético, y aspectos económicos, sociales, culturales o salud pública". Regla 203, Reglamento sobre Documentos Ambientales, *supra*.

[20] No obstante, no será necesario presentar una Evaluación Ambiental si la agencia proponente ya ha determinado que va a presentar una Declaración de Impacto Ambiental sobre la acción propuesta, o si el proyecto se va tramitar como una exclusión categórica. Regla 241, Reglamento sobre Documentos Ambientales, *supra*.

[21] Regla 243, Reglamento sobre Documentos Ambientales. En la Regla 252 del Reglamento sobre Documentos Ambientales se detallan diversas instancias en las que se requerirá la preparación de una Declaración de Impacto Ambiental:

A. Se requiere la preparación de una DIA para toda acción que pueda tener un impacto significativo sobre la calidad del ambiente. Específicamente, se requerirá la preparación de una DIA cuando dicho impacto significativo pudiera ocurrir como consecuencia de factores, tales como:

no realizará acto alguno con respecto a la acción propuesta sin antes haber concluido el proceso de análisis de la evaluación ambiental y el proceso de determinación de impacto ambiental. Regla 243, Reglamento sobre Documentos Ambientales; *Cf*. 12 L.P.R.A. sec. 1124(c). Como puede colegirse de lo anterior, el trámite de preparar una declaración de impacto ambiental, está reservado para aquellas ocasiones en que, por la gran magnitud del impacto

---

1. Cualquier acción que pueda degradar significativamente los usos del ambiente;

2. Cualquier acción cuya realización conlleve la utilización de una parte sustancial de la infraestructura disponible en el área de la ubicación propuesta. Dicha determinación será respaldada y tomada por la, o las, instrumentalidades públicas que habrán de proveer dicho servicio o infraestructura;

3. Cualquier acción que pueda impactar significativamente un área en donde existan recursos naturales o valores de importancia ecológica, recreativa, social, cultural o arqueológica;

4. Cualquier acción a efectuarse en etapas cada una de las cuales no requerirán una DIA, pero que en su conjunto podrían tener un impacto significativo acumulativo. Tales casos requerirán una DIA que integre el impacto conjunto de todas las etapas, según pueda preverse, hasta alcanzar su desarrollo final;

5. La instalación de cualquier sistema de relleno sanitario;

6. La instalación de cualquier Fuente Mayor de Emisión.

B. La Junta de Gobierno podrá requerir una DIA para cualquier acción que a su juicio y por razón de sus particularidades determine que pueda tener impacto ambiental significativo, aunque la acción no esté claramente incluida en la Regla 252A de este Reglamento. Regla 252, Reglamento sobre Documentos Ambientales, *supra*.

ambiental de la acción propuesta, (impacto significativo o sustancial), no sólo se requiere un análisis más riguroso de la acción, sino también que se examinen alternativas a la misma.[22]

En la Regla 242 del Reglamento sobre Documentos Ambientales se establecen los requisitos de contenido para la Evaluación Ambiental. Entre los numerosos asuntos que se deben describir y discutir en la evaluación ambiental se encuentran: un listado de la flora y la fauna existente en el área; **sistemas naturales tales como humedales, reservas naturales u otros que estén localizados dentro de una distancia de 400 metros, medidos desde el perímetro del proyecto, indicándose la distancia a la que se encuentran del proyecto; medidas de protección a los sistemas naturales existentes;** indicar si el proyecto o alguno de sus componentes estará ubicado en una **zona inundable**, identificar la zona y la cota o **nivel de inundación máxima del área donde estará ubicado el proyecto**; un análisis del posible impacto ambiental que tendrá el proyecto propuesto y medidas de mitigación para minimizar dicho impacto; una determinación de si la acción propuesta conllevará un impacto ambiental significativo, y, en caso de que la agencia proponente determine que no habrá un impacto ambiental significativo, deberá incluir un análisis narrativo que justifique dicha

---

[22] Compárense las Reglas 242-43 del Reglamento sobre Documentos Ambientales, *supra,* (requisitos aplicables a las evaluaciones ambientales), con las Reglas 253-255 de dicho Reglamento (requisitos aplicables a las declaraciones de impacto ambiental).

determinación. Regla 242(C)(D), Reglamento sobre Documentos Ambientales, *supra*.

Mediante su quinto señalamiento de error, la parte peticionaria argumentó que incidió el Tribunal de Apelaciones al concluir que era necesaria la preparación de una declaración de impacto ambiental para el proyecto propuesto.

El foro apelativo entendió que la acción propuesta tendría un impacto ambiental significativo debido a que: (1) cerca del área donde estaría ubicado el proyecto se encontraban la Reserva Natural caño La Boquilla y humedales que podrían ser afectados por el desarrollo; y (2) el predio estaba ubicado en una zona susceptible a inundaciones. Sin embargo, del expediente surge que **las agencias con conocimiento especializado** en materia ambiental y en la implementación de las normas sobre desarrollos en zonas inundables, después de haber considerado los documentos relacionados al proyecto, no sólo **consideraron que la acción propuesta no tendría un impacto ambiental significativo** sobre los mencionados sistemas naturales, (y por ende que no era necesaria una declaración de impacto ambiental para el proyecto), sino que además condicionaron sus endosos a que antes de ejecutarse el proyecto se tomaran varias **medidas de protección** a los sistemas naturales existentes y se cumpliesen diversos reglamentos para **mitigar** cualquier impacto que pudiera haber.

La Reserva Natural caño Boquilla está integrada en su mayoría por cuerpos de agua tales como humedales y terrenos en la zona marítimo terrestre. En la evaluación ambiental los

proponentes expusieron que dicho sistema natural queda a más de 400 metros de distancia de donde estaría el proyecto y, por ello, no se vería impactado significativamente. Por una razón similar indicaron que no habría impacto ambiental significativo a un humedal que está localizado al norte de la carretera que colinda con la propiedad, a 200 metros lineales de donde estaría el proyecto. Expusieron también que el proyecto ubicaría a 400 metros de un tributario del canal de la Boquilla. Para evitar cualquier efecto al mismo por la construcción y operación del proyecto, se tomarían medidas tales como colocar fardos de heno, barreras y/o mallas para evitar los efectos de la **escorrentía** de aguas de construcción, materiales y sedimentos causados por la construcción, además de cumplir con las condiciones impuestas por el Departamento de Recursos Naturales. Además, para controlar la cantidad y la calidad de las aguas que alimenten el sistema de drenaje natural de los terrenos durante la operación del proyecto, el mismo contaría con una charca de retención de agua de escorrentía.

Se indicó que **parte del proyecto estaría ubicado en un área inundable tipo Zona 2**, según el Mapa de Zonas Susceptibles a Inundación de la Junta de Planificación, Hola #13-D del 5 de mayo de 1998. Con respecto al nivel de inundación, se indicó que conforme a la reglamentación aplicable todas las condiciones necesarias para construir en la Zona 2 donde estaría ubicado el proyecto eran conocidas, puesto que ya se ha delimitado un cauce mayor para el valle y

se conoce cuál es el **nivel de inundación base**.[23] De los documentos que constan en el expediente, incluyendo el mapa de zonas susceptibles a inundaciones y el escrito presentado por la Junta de Planificación ante el Tribunal de Apelaciones, surge que el nivel de inundación base para el predio objeto de consulta es de 5.5 metros sobre el nivel del mar. En la evaluación ambiental se hizo constar que el nivel de piso más bajo de todas las estructuras del proyecto estaría elevado sobre el nivel de inundación base. Véase Regla 7.03, Reglamento sobre Zonas Susceptibles a Inundaciones, *supra,* (disponiendo que toda nueva construcción para usos comerciales en una Zona 2 donde se ha delimitado el cauce mayor y se conoce el nivel de inundación base tendrá la elevación de piso más bajo por encima del nivel de inundación base).

Sobre este punto, los proponentes añadieron que cumplirían con todos los requisitos que impusiera la Junta de Planificación en la aprobación de la consulta y que el diseño del proyecto cumpliría con el Reglamento sobre Zonas Susceptibles a Inundaciones.

El Departamento de Recursos Naturales, agencia que promovió la designación del caño La Boquilla como reserva natural y que además es uno de los organismos designados por ley para formular e implementar la normativa aplicable a las

---

[23] El **"nivel de inundación base"** es la "[e]levación máxima que alcanzarían las aguas desbordadas de un río, quebrada o arroyo durante una inundación base. Es la elevación que tendría un (1%) por ciento de probabilidad de ser igualada o excedida en cualquier año". Regla 5.02, Reglamento sobre Zonas Susceptibles a Inundaciones, *supra*, en la pág. 22 (énfasis suplido).

zonas inundables, examinó la veracidad y corrección de los documentos ambientales sometidos por los proponentes. Incluso, según se afirma en la evaluación ambiental, sin que los recurridos o el tribunal *a quo* lo hayan negado, personal de dicha agencia hizo una inspección de campo en el predio objeto de consulta.

Después de dicho proceso, el Departamento de Recursos Naturales **afirmó que no tenía objeción a la etapa de ubicación del proyecto y que la evaluación ambiental era de su conformidad**. No obstante, formuló una serie de requisitos con los que el proyecto tendría que cumplir y que detallamos a continuación. Debido a que parte del desarrollo ubicaría en un área inundable, **el proyecto tendría que cumplir con el Reglamento sobre Zonas Susceptibles a Inundaciones**. Además, tendrían que observarse las disposiciones del Reglamento de Lotificación y Urbanización sobre el **manejo de aguas pluviales**. Dichas disposiciones tienen el propósito de **"proteger y conservar la calidad del ambiente natural** y la seguridad de los desarrollos en las cuencas reglamentando el **control de la erosión, sedimentación y escorrentía de forma que no se alteren sustancialmente las funciones de los cuerpos de agua por el desarrollo propuesto"**. Véase 15.00, Reglamento de Lotificación y Urbanización, Reglamento de Planificación Núm. 3, Reglamento Núm. 4794, Departamento de Estado, efectivo el 25 de octubre de 1992 (énfasis suplido).[24]

---

[24] Véanse, además, las revisiones sucesivas del Reglamento sobre Lotificación y Urbanización, en las cuales

El Departamento de Recursos Naturales, además, exigió estrictamente que los proponentes obtuvieran un "Permiso para el Control de Erosión y Prevención de Sedimentación" de la Junta de Calidad Ambiental, **con el propósito de evitar la sedimentación hacia el Caño Boquilla**. Según el Departamento, esta precaución era primordial debido a que, por la **inundabilidad** del predio donde estaría el proyecto, se requeriría el depósito de relleno para poderlo construir.

El Departamento también estableció que, debido a que el proyecto colindaba con un canal y con la quebrada Boquilla, debería dedicarse a uso público una faja verde de 5 metros a partir del borde de la quebrada y el canal, y además debía asegurarse que si se construían taludes debían descansar fuera de la faja de terreno de la quebrada Boquilla. Aparte de lo anterior, dicha agencia determinó que "ante la posible presencia de humedales en el área del proyecto, el proponente deberá consultar al Cuerpo de Ingenieros del Ejército de Estados Unidos". Por último, hizo constar en su misiva que el endoso a la evaluación ambiental y a la etapa de consulta no autorizaba a los proponentes a mover material de la corteza terrestre ni a realizar ningún trabajo hasta que se cumpliera con todos los reglamentos correspondientes.

El Cuerpo de Ingenieros del Ejército de Estados Unidos requirió a los proponentes que le sometieran un estudio sobre determinación de jurisdicción para identificar la presencia

---

existe una disposición equivalente e idéntica a la citada arriba. Sección 14.01, Reglamento de Lotificación y Urbanización, Reglamento de Planificación Núm. 3, Núms. 6992 y 6283, Departamento de Estado, efectivos el 23 de julio de 2005 y el 3 de febrero de 2001, respectivamente.

de humedales en el área donde estaría ubicado el proyecto. Dicho requerimiento obedeció a que, según el Cuerpo de Ingenieros, de acuerdo al inventario nacional de humedales, en el predio objeto de consulta existían humedales.[25] La agencia federal indicó que ella tendría la última palabra en cuanto a la determinación de su jurisdicción. Los proponentes no llevaron a cabo el estudio sobre determinación de jurisdicción solicitado por el Cuerpo de Ingenieros.

La Junta de Calidad Ambiental, en comunicación de 12 de junio de 2003, certificó que la evaluación ambiental y los documentos presentados cumplieron con el requisito de evaluar el impacto ambiental del proyecto propuesto según lo requería el artículo 4(c) de la Ley 9 y, por ende, que el proyecto no tendría impacto ambiental significativo.[26]

_____

[25] El Servicio de Pesca y Vida Silvestre de Estados Unidos, al igual que el Cuerpo de Ingenieros, hizo referencia al inventario nacional de humedales y le requirió a los proponentes que, ante la posibilidad de que el proyecto pudiera impactar los humedales, contactara al Cuerpo de Ingenieros e hiciera una determinación de jurisdicción. Además, concluyó que en el área no existían especies en peligro de extinción.

[26] Los recurridos, quienes no participaron del proceso ante la Junta de Calidad Ambiental, no solicitaron revisión judicial de esta determinación. No la cuestionaron sino hasta el año 2004, cuando la Junta de Planificación aprobó la consulta de ubicación.

La parte peticionaria plantea, aunque sin discutirlo a fondo, que el cuestionamiento de los recurridos sobre la suficiencia de la evaluación ambiental es un ataque colateral que no es permisible. Dicho planteamiento de ataque colateral no fue discutido ante el Tribunal de Apelaciones y ni dicho foro, ni la agencia revisada, pasaron juicio sobre el mismo. Debido a ello, no tenemos que resolverlo. Autoridad sobre Hogares v. Sagastivelza, 71 D.P.R. 436 (1950); Trabal Morales v. Ruiz Rodríguez, 125 D.P.R. 340 (1990). No obstante, debe notarse que en el pasado hemos resuelto que las controversias relacionadas con la protección del medio ambiente y la pureza

La Junta de Calidad Ambiental enfatizó en su comunicación, en concordancia con lo expuesto por el Departamento de Recursos Naturales para evitar la sedimentación hacia el Caño Boquilla, que antes de comenzar la construcción los proponentes deberían obtener **un permiso para el control de la erosión y prevención de la sedimentación**, entre otros. Además, deberían cumplir con los requisitos y recomendaciones hechos por las agencias estatales y federales concernidas, entre ellas, el Cuerpo de Ingenieros y el Departamento de Recursos Naturales, además de los exigidos por la propia Junta de Calidad Ambiental, a cumplirse previo a dar comienzo a la construcción o efectuar un movimiento de tierra.[27]

---

en los procesos de planificación urbana están revestidas de interés público, circunstancia que opera como excepción a la aplicación de la doctrina de cosa juzgada. Mun. de San Juan v. Bosque Real, S.E., res. 4 de marzo de 2003, 158 D.P.R. ___, 2003 TSPR 31, 2003 JTS 33, 635. Véase además T-JAC, Inc. v. Caguas Centrum Limited, *supra*, págs. 79-80, 91-94, donde como aquí pasamos juicio acerca del requisito de presentar una declaración de impacto ambiental a través de un recurso de revisión, el cual fue presentado para cuestionar la aprobación de una consulta de ubicación por la Junta de Planificación, con posterioridad a que la Junta de Calidad Ambiental avalara una determinación de impacto ambiental no significativo.

[27] Entre otras cosas, la Junta de Calidad Ambiental le exigió a los proponentes que obtuvieran: un Permiso de Fuente de Emisión (PFE) para el polvo fugitivo durante la fase de construcción, un Permiso para Realizar una Actividad Generante de Desperdicios Sólidos (Formulario DS-3), un Permiso para el Control de Erosión y Prevención de la Sedimentación. Señaló además que, durante la fase de construcción los proponentes debían **tomar medidas para evitar** que residuos de sustancias orgánicas e inorgánicas tales como aceite, combustible y otras sustancias químicas **sean arrastrados por la escorrentía y ganen acceso a cualquier cuerpo de agua superficial o subterráneo.**

Como anticipamos, de lo expuesto por las agencias especializadas en materia ambiental surge que éstas concluyeron que la acción propuesta no tendría un impacto ambiental significativo y, por ende, no era necesario preparar una declaración de impacto ambiental. Llegaron a esta conclusión después de haber ponderado y hecho un análisis acerca de la situación del predio objeto de consulta y sus alrededores, los sistemas naturales cercanos y la condición de inundabilidad del predio, según surge de la evaluación ambiental y demás documentos sometidos. Como parte de sus análisis **sujetaron el desarrollo del proyecto a la obtención de diversos permisos y al cumplimiento de diversas condiciones para proteger la calidad del ambiente.** Dichas condiciones, y otras adicionales, fueron incorporadas por la Junta de Planificación en la Resolución mediante la cual aprobó la consulta de ubicación.

Las determinaciones de dichos organismos especializados no sólo merecen gran consideración y respeto sino que están cobijadas por una presunción de regularidad y corrección. P.C.M.E. v. J.C.A., *supra*; Otero v. Toyota, *supra*. **Los recurridos no han demostrado que de la totalidad del expediente administrativo surja otra prueba que menoscabe dichas determinaciones y las medidas que disponen hasta el punto de hacerlas irrazonables.** No cabe duda de que vistos en conjunto todos los requerimientos formulados por las agencias estatales y federales concernidas con respecto al proyecto en cuestión, podría pensarse que se trata de una propuesta de mucha sensitividad ecológica, y la necesidad de preparar una

declaración de impacto ambiental surge a la mente. Entendemos, pues, las cavilaciones que preocuparon al foro apelativo. Pero la misión judicial en casos como el de autos, repetimos, no es sustituir nuestro criterio por el de la Junta de Calidad Ambiental. **No nos toca a nosotros emitir el juicio sobre la procedencia de una DIA**. Nuestro rol se limita a determinar si el criterio especializado de dicha agencia **no tiene una base racional**. No basta que concluyamos que la decisión de la Junta no es correcta o que no es la más deseable. Para intervenir, es menester que podamos demostrar con base al expediente que dicha decisión es claramente errónea por carecer de una base racional. Y tal no es el caso aquí. Al sustituir el criterio de las agencias especializadas por el suyo, el foro apelativo incidió. El quinto error fue cometido.

D.  Obligación de presentar un estudio hidrológico-hidráulico para construir en una Zona 2 de las áreas susceptibles a inundaciones

La Ley para el Control de Edificaciones en Zonas Susceptibles a Inundaciones, (en adelante Ley de Zonas Inundables), fue aprobada por la Asamblea Legislativa de Puerto Rico con el objetivo de reducir o eliminar la pérdida de vidas y residencias por el efecto de las inundaciones. Exposición de Motivos, Ley Núm. 3 de 27 de septiembre de 1961, 23 L.P.R.A. sec. 225. En aras de lograr dicha meta, la Legislatura facultó a la Junta de Planificación para que, en

coordinación con otras agencias especializadas como el Departamento de Recursos Naturales, tomara las siguientes medidas: (1) declarar cuáles son las zonas susceptibles a inundaciones, divulgando dichas designaciones a través de la prensa; (2) preparar y adoptar mapas de las zonas susceptibles a inundaciones; y (3) adoptar un Reglamento en el cual se establezcan normas de seguridad para controlar la edificación y el desarrollo en las zonas susceptibles a inundaciones, de acuerdo a la intensidad del peligro a que estén expuestas las familias y las viviendas que se ubiquen en las mismas. 23 L.P.R.A. 225b-225f.

Al amparo de la autoridad que le fue conferida por la legislación mencionada, la Junta de Planificación promulgó el Reglamento sobre Zonas Susceptibles a Inundaciones. Véase Reglamento de Planificación Núm. 13, Reglamento Núm. 6516, Departamento de Estado, vigente el 5 de septiembre de 2002 (en adelante Reglamento de Zonas Inundables).[28] Las disposiciones de dicho Reglamento aplican: a las zonas susceptibles a inundaciones y a las zonas provisionales inundables, (según estas sean designadas por la Junta de Planificación), y a las propiedades que ubiquen en las mismas; a toda persona natural o jurídica, pública o privada y a cualquier agrupación de ellas; y a los terrenos que por

---

[28] Recientemente, dicho Reglamento fue modificado al ser promulgada por la Junta de Planificación la 6ta revisión del mismo. Véase Reglamento sobre Áreas Especiales de Riesgo a inundación, Reglamento Núm. 7092, Departamento de Estado, efectivo el 11 de marzo de 2006. No obstante, es menester aclarar que la normativa que tenemos ante nos se rige a la luz de las disposiciones de la 5ta revisión de dicho Reglamento, vigente desde el 5 de septiembre de 2002.

su naturaleza topográfica o por su localización respecto a un cuerpo de agua tengan un historial de inundaciones o estén en riesgo. Sección 1.04, Reglamento de Zonas Inundables, *supra*, en la pág. 3.

En concordancia con los objetivos que inspiraron la Ley de Zonas Inundables, su Reglamento tiene el propósito de: (a) restringir o prohibir desarrollos cuando estos aumenten el nivel de inundación y la velocidad de las aguas propiciando la erosión; (b) tomar medidas para que se protejan los proyectos vulnerables a las inundaciones; (c) evitar o controlar la alteración de valles inundables naturales, cursos de agua, barreras protectoras naturales que acomodan o canalizan aguas de inundación o marejadas; (d) controlar el relleno, la nivelación, el dragado y otro tipo de desarrollo que pueda aumentar los daños por concepto de inundaciones o marejadas; (e) evitar o controlar la construcción de barreras que impidan el flujo de las aguas y aumenten los riesgos de inundación para otras áreas; y (f) no promover nuevos desarrollos, obstáculos o mejoras sustanciales a menos que se haya demostrado que se han evaluado otras alternativas de localización y que las mismas no son viables. Sección 1.03, Reglamento de Zonas Inundables, *supra*.

Como adelantáramos, en el Reglamento se clasifican las áreas inundables en diversas zonas. Para realizar dicha denominación se toman en consideración:

> [La designación de dichas áreas] en los Mapas de Tasas de Seguro Contra Inundaciones, Mapas de Cauce Mayor y Límites de Inundación o cualquier otra información sobre inundación base, y marejadas, incluyendo consideraciones sobre los

niveles, profundidad y velocidad de las aguas, altura de las olas, la condición y características topográficas del terreno y de su cubierta vegetal y el riesgo a que están expuestas la vida y hacienda de las personas establecidas o que se establezcan en los terrenos. Sección 5.01, Reglamento de Zonas Inundables, *supra*, en la pág. 39.

Una de dichas clasificaciones es la conocida como Zona 2, la cual es la aplicable al predio objeto de consulta en este caso. La Zona 2 es un área ubicada entre el **cauce mayor**[29] y el **valle inundable**.[30] Sección 5.02, Reglamento de Zonas Inundables, *supra*. Dicha Zona es susceptible de ser afectada por la **inundación base**,[31] pero excluye al cauce

---

[29] El vocablo **"cauce"** se define como "el lecho de u río, quebrada o arroyo por donde normalmente fluyen las aguas". Regla 5.02, Reglamento sobre Zonas Susceptibles a Inundaciones, *supra*, en la pág.8. El concepto **"cauce mayor"**, a su vez, incluye no solo al cauce o a un drenaje pluvial natural, sino también a los terrenos adyacentes a los mismos que deben ser reservados para descargar la **inundación base** sin aumentar acumulativamente la elevación superficial de las aguas por más de 0.30 metros (1 pie) en áreas no desarrolladas o de 0.15 metros [medio (1/2 pie] en áreas desarrolladas, según determinada por un estudio hidrológico-hidráulico". Regla 5.02, Reglamento sobre Zonas Susceptibles a Inundaciones, *supra*, en la pág. 8.

Se define **"inundación base"** como aquella "[i]nundación que tiene un uno (1%) por ciento de probabilidad de ser igualada o excedida en un año dado. Se conoce como una inundación con un período de recurrencia de 100 años". Regla 5.02, Reglamento sobre Zonas Susceptibles a Inundaciones, *supra*, en la pág. 16.

[30] El **"valle inundable"** está compuesto por "[t]errenos llanos o semi-llanos normalmente secos y susceptibles a inundaciones por aguas provenientes de una fuente natural. Usualmente es un área baja adyacente a un río, quebrada, arroyo, océano o lago afectados por la inundación de niveles más altos conocida en la historia de la región o por la **inundación base**, según ilustrados en estudios y mapas disponibles hasta el presente". Regla 5.02, Reglamento sobre Zonas Susceptibles a Inundaciones, *supra*, en la pág. 27.

[31] Véase, *supra* nota 29 y el texto que le acompaña.

mayor, a las áreas costaneras de alto peligro y, en terrenos en los cuales ya se ha determinado el **nivel de inundación base**,[32] excluye también al valle inundable. A diferencia de lo que ocurre en la Zona 1,[33] donde las restricciones son mayores, en la Zona 2 no hay que demostrar que se han evaluado otras localizaciones no inundables, que no resultan viables, como prerrequisito para que se permita realizar acciones tales como ubicar estructuras, relleno y otros **desarrollos**.[34]

No obstante, sí hay que cumplir con otra serie de requisitos que están contenidos en las Secciones 7.01–7.07 del Reglamento. **Uno de dichos requisitos es el de realizar un estudio hidrológico-hidráulico.** Dicho estudio técnico y científico consiste en realizar un análisis de las características de los cuerpos de agua y sus terrenos

---

[32] El **"nivel de inundación base"** es la **"[e]levación máxima** que alcanzarían las aguas desbordadas de un río, quebrada o arroyo durante una inundación base. Es la elevación que tendría un (1%) por ciento de probabilidad de ser igualada o excedida en cualquier año". Sección 5.02, Reglamento de Zonas Inundables, *supra*, en la pág. 22 (énfasis suplido).

[33] La Zona 1 "[i]ncluye los terrenos que ubiquen dentro de los límites del cauce mayor (Floodway)". Sección 5.02, Reglamento de Zonas Inundables, *supra*, en la pág. 39. La Zona 1M, por su parte, "[i]ncluye los terrenos que ubiquen en las áreas costaneras de alto peligro". Sección 5.02, Reglamento de Zonas Inundables, *supra*, en la pág. 40.

[34] Se define desarrollo como "[c]ualquier cambio hecho por el hombre a propiedades mejoradas o sin mejorar incluyendo, pero sin limitarse a, edificios u otras estructuras, minería, dragado, relleno, nivelación, pavimentación, excavación; perforaciones o almacenaje de equipo y materiales localizados dentro de una zona susceptible a inundaciones". Sección 5.02, Reglamento de Zonas Inundables, *supra*, en la pág. 12.

adyacentes, para así estimar los niveles de inundaciones para diferentes eventos recurrentes en una cuenca hidrográfica. Sección 2.01, Reglamento de Zonas Inundables, *supra*. En otras palabras, la finalidad del mismo es determinar las descargas de agua para distintos eventos de inundación. Sección 2.01, Reglamento de Zonas Inundables, *supra*.

Con respecto a las situaciones en las que se requerirá la presentación de un estudio hidrológico-hidráulico para desarrollos en una Zona 2, en la Sección 7.02 del Reglamento de Zonas Inundables se establece lo siguiente:

a. **Para desarrollos en terrenos que radiquen en zonas susceptibles a inundaciones en las cuales se desconozca el nivel de inundación base** (identificadas como Zonas A en los Mapas de Tasas de Seguro Contra Inundaciones), **el proponente, junto a su solicitud, someterá estudios hidrológicos e hidráulicos** y propuestas específicas a la Junta o a la Administración de Reglamentos y Permisos, según corresponda, para cumplir con la Subsección 7.01(4) y proteger los terrenos objeto de la petición de los efectos de inundaciones o marejadas. De ser estas propuestas aceptadas, previo endoso del Departamento de Recursos Naturales y Ambientales, las medidas u obras recomendadas serán incluidas en las obras de urbanización y tiene que estar en operación antes de la ocupación de las estructuras construidas en estos terrenos. **En los casos donde se proponga el depósito de relleno en la propiedad, se cumplirá con lo que se establece en la Subsección 7.07** y se obtendrán todos los endosos y permisos necesarios de las agencias gubernamentales concernidas, incluyendo aquéllas que pudieran requerirse bajo las disposiciones de la Sección 404 de la Ley Federal Sobre el Control de Contaminación de Agua, según enmendada en 1972 (PL 92-500).

. . .

. . .

b. **Podrá eximirse al proponente de preparar estudios hidrológicos – hidráulicos para desarrollos en terrenos que radiquen en aquellas cuencas para las que se han realizado estudios hidrológicos – hidráulicos por algún organismo estatal o federal o por alguna entidad privada, si éstos hubieran sido aceptados por el Departamento de Recursos Naturales y Ambientales y la Junta o la Administración de Reglamentos y Permisos, según corresponda. No obstante y en conformidad con el estudio hidrológico – hidráulico que se haya preparado para proteger los terrenos objeto de la petición de los efectos de inundaciones, el proponente someterá con las propuestas los estudios técnicos que las sustenten.** En aquellos casos en, que se hayan realizado los estudios para un plan integral de control de inundaciones, el plan deberá estar construido previo al comienzo de la construcción del desarrollo.

**Se podrá eximir además del estudio [hidrológico–hidráulico]** aquellos casos de construcción o mejora sustancial en uso residencial o no residencial, donde el nivel de piso podrá estar a dos (2) pies o más sobre la elevación de terreno adyacente más alta en el solar o según recomendaciones de literatura disponible de la FEMA.

**La Junta de Planificación o la ARPE se reserva la opción de solicitar estudios adicionales en el caso de que ocurra o pueda ocurrir un efecto acumulativo en el área o por otra condición.**

c. Los estudios hidrológicos – hidráulicos seguirán las normas y procedimientos vigentes y deberán realizarse bajo la mejor práctica de la ingeniería, utilizando una metodología aceptada por las agencias reguladoras estatales y por la FEMA y que el estudio se fundamente en reglamentación estatal, federal y vigentes. Sección 7.02 del Reglamento de Zonas Inundables, supra (énfasis suplido).

Por otro lado, en la Sección 7.07 del Reglamento, a la que se alude en el inciso (a) de la disposición transcrita, se establece en parte lo siguiente:

**La Junta o la Administración de Reglamentos y Permisos, según corresponda, podrán permitir el depósito de relleno en esta Zona cuando se**

**demuestre mediante un estudio hidrológico-hidráulico**, que el relleno a depositarse tiene un propósito beneficioso y que la cantidad a depositarse no excederá aquella necesaria para obtener dicho propósito ni constituirá un obstáculo para el libre flujo de las aguas de inundación o marejadas o un perjuicio a otras propiedades.

**Deberá demostrarse que el relleno depositado no se asentará bajo el nivel de la inundación base** y que está protegido adecuadamente de las fuerzas de la erosión, corrientes rápidas o asentamiento diferencial, según se describe en los incisos b, c y d:

    a. El análisis hidráulico para evaluar relleno propuesto se basará en la presunción de que habrá un obstáculo a cada lado del valle inundable, el cual reducirá por igual la capacidad hidráulica de modo que **el nivel de inundación base estimado en condiciones naturales no aumente más allá del máximo permitido,** 0.15 metros en áreas; desarrolladas 0.30 metros, áreas no desarrolladas. Posterior a éste se permitirá ajustar los limites siempre que no se aumente el nivel de inundación base más allá de lo máximo permitida, de lo contrario se deberá notificar las partes afectadas.

**Se eximirá del requisito de presentar un estudio hidrológico – hidráulico si se demuestra que el depósito de relleno cumple con la Sección 7.02, Incisos (2) y (3).** Sección 7.07 del Reglamento de Zonas Inundables, *supra*, (énfasis suplido).

A base de las normas esbozadas debemos determinar si es necesario presentar un estudio hidrológico-hidráulico para desarrollar un proyecto en una Zona 2 inundable en la cual el nivel de inundación base es conocido, como ocurre en el caso de autos. La Junta de Planificación no exigió tal estudio y argumentó ante el Tribunal de Apelaciones (como ahora lo hace ante nosotros) que dicho estudio no era

necesario debido a que el nivel de inundación base para el predio objeto de consulta era conocido. El Tribunal de Apelaciones, por su parte, concluyó que dicho estudio sí era requerido por el mencionado Reglamento. En consecuencia, dicho foro revocó la determinación de la Junta de Planificación sobre este aspecto.

En su sexto señalamiento de error ante nos, los proponentes argumentaron, al igual que la Junta, que toda vez que el nivel de inundación base del predio objeto de consulta era conocido, no se requería presentar un estudio hidrológico y, por ello, que erró el foro apelativo al concluir lo contrario. Apoyan su aseveración en el fragmento del inciso (a) de la citada Sección 7.02, que dice que "[p]ara desarrollos en terrenos que radiquen en zonas susceptibles a inundaciones **en las cuales se desconozca el nivel de inundación base**. . . el proponente, junto a su solicitud, someterá estudios hidrológicos e hidráulicos". **No tienen razón los proponentes-peticionarios.**

En primer lugar, de la propia Sección 7.02 del Reglamento de Zonas Inundables surge que cuando se proponga el depósito de relleno en la propiedad, se cumplirá con lo establecido en la Sección 7.07. En la Sección 7.07, a su vez, se indica que **se podrá permitir el depósito de relleno en la Zona 2 cuando se demuestre mediante un estudio hidrológico-hidráulico** que el relleno a depositarse tiene un propósito beneficioso y que no constituirá un obstáculo para el libre flujo de las aguas de inundación. Específicamente, se instruye en dicha sección que **deberá demostrarse que el**

**relleno depositado no se asentará bajo el nivel de la inundación base** y que el relleno no deberá aumentar dicho nivel por encima del máximo establecido en la propia regla.

Según informaron los mismos proponentes-peticionarios en la evaluación ambiental, **el proyecto propuesto conllevará el depósito de relleno para nivelar el predio**. Asimismo, el Departamento de Recursos Naturales, entre los comentarios y condiciones que hizo después de haber evaluado la propuesta, **señaló que debido a la condición de inundabilidad del predio el proyecto requerirá el depósito de relleno** y que tendrían que cumplirse las disposiciones del Reglamento de Zonas Inundables.

De todo lo anterior surge que los proponentes tienen que preparar un estudio hidrológico-hidráulico para el proyecto propuesto. Lógicamente, el hecho de que el nivel de inundación base del predio sea conocido no cambia lo anterior porque entre las cosas que tienen que demostrarse en dicho estudio están precisamente que el relleno depositado no se asentará bajo el nivel de inundación base y que el relleno no aumentará dicho nivel por encima del máximo establecido en la propia Sección. Véase Sección 7.07, Reglamento de Zonas Inundables, *supra*.

Por otro lado, los peticionarios tampoco han demostrado ni argumentado que su proyecto esté cobijado por alguna de las excepciones **sí** establecidas al requisito de presentar un estudio hidrológico-hidráulico. En la Sección 7.02 del Reglamento de Zonas Inundables, a la que la Sección 7.07 refiere como situaciones de excepción, se establecen los

supuestos en los que no será necesario presentar un estudio hidrológico-hidráulico en una Zona 2. En uno de dichos supuestos se indica que puede eximirse al proponente de presentar dicho estudio para desarrollos en terrenos que radiquen en cuencas para las cuales ya se haya realizado un estudio hidrológico-hidráulico que hubiera sido aprobado por el Departamento de Recursos Naturales y la Junta de Planificación o la Administración de Reglamentos y Permisos. Sección 7.02, Reglamento de Zonas Inundables, *supra*. Ni los proponentes ni la Junta de Planificación han demostrado que lo anterior haya ocurrido en este caso.[35]

Además, incluso si se argumentara ahora que existe tal estudio, la propia Sección 7.02 condiciona la excepción a que, junto con la propuesta de desarrollo, los proponentes sometan cálculos y estudios técnicos que, de conformidad con el estudio hodrológico-hidráulico, respalden la propuesta, lo que no se ha hecho aquí. Por si todo ello fuera poco, el propio Reglamento da discreción a la Junta de Planificación

---

[35] Si bien en sus comentarios a la consulta de ubicación el Municipio de Mayagüez condicionó su endoso a que se cumplieran las disposiciones establecidas en "el estudio hidrológico-hidráulico actualizado", los peticionarios (al igual que la Junta) no han argumentado ante nosotros que tal estudio exista, ni lo presentaron a las agencias, ni han demostrado que haya sido aprobado por las agencias correspondientes. De hecho, como hemos reseñado ya, la contención de los peticionarios en este caso es que, dadas las condiciones del predio objeto de consulta, no hay que presentar un estudio hidrológico. Aunque la Junta de Planificación indicó en su Resolución aprobatoria que el estudio al que se refirió el Municipio fue realizado por el Departamento de Recursos Naturales, ni ello surge de la comunicación del Municipio, ni dicho Departamento, supuesto autor del estudio, dijo en sus comentarios que existiera un estudio hidrológico-hidráulico para el terreno objeto de este recurso. De hecho, ninguna de las agencias comentadoras ha determinado lo anterior.

o a la Administración de Reglamentos y Permisos para ordenar estudios adicionales en caso de que entiendan que puede ocurrir un efecto acumulativo en el área o por otra condición. Sección 7.02, Reglamento de Zonas Inundables, *supra*.

A la luz de lo discutido aquí resulta forzoso concluir que los peticionarios tienen que presentar un estudio hidrológico-hidráulico para el desarrollo propuesto. Consecuentemente, procede confirmar al Tribunal de Apelaciones en cuanto a este asunto. El sexto error no fue cometido.

E.    Permiso del Cuerpo de Ingenieros del Ejército de Estados Unidos

En su séptimo señalamiento de error, la parte peticionaria adujo que había errado el Tribunal de Apelaciones al revocar la consulta de autos por falta de un permiso del Cuerpo de Ingenieros del Ejército de Estados Unidos. Para sustentar su señalamiento los proponentes argumentaron que para el proyecto propuesto no era necesario dicho permiso toda vez que el área donde están los humedales no será afectada por el mismo. En esa línea, sostienen que el propósito de la determinación de jurisdicción del Cuerpo de Ingenieros es asegurar que no se construirán edificaciones sobre los humedales. Por lo tanto, como en este proyecto no se construirá en los humedales, los peticionarios argumentan que no es necesario el permiso del

Cuerpo de Ingenieros. **No tienen razón los proponentes-peticionarios.**

Del expediente de este caso surge que los proponentes presentaron ante el Cuerpo de Ingenieros una solicitud de evaluación del proyecto. En respuesta a ello, dicha agencia federal les informó que, según el inventario nacional de humedales, en el predio objeto de consulta existían humedales, y les instruyó a que prepararan un estudio para determinar si la agencia tenía jurisdicción sobre esos humedales.[36] **Los proponentes no cumplieron con lo anterior.**

En la evaluación ambiental, que fue aprobada por la Junta de Calidad Ambiental como es requerido bajo la Ley de Política Pública Ambiental para efectuar la acción propuesta, los proponentes indicaron que estaban realizando el estudio de determinación de jurisdicción requerido. Igual postura asumieron en la ponencia que presentaron ante la Junta de Planificación en la vista pública sobre el proyecto.

Después de evaluar los documentos relacionados a la consulta de autos, todas las agencias estatales y federales con algún grado de *expertise* en temas ambientales condicionaron su endoso al proyecto a que los proponentes obtuvieran un permiso del Cuerpo de Ingenieros o les instruyeron a que le hicieran una consulta a dicha agencia federal.[37] Dichas recomendaciones, además, fueron

---

[36] Igual requerimiento hizo el Servicio de Pesca y Vida Silvestre de Estados Unidos.

incorporadas por la Junta de Planificación en la Resolución mediante la cual aprobó la consulta de autos. Incluso, el propio Reglamento de Zonas Inundables de la Junta de Planificación establece que para proyectos como el de autos, que radicarían en predios inundables en los cuales se va a rellenar, el proponente, además de cumplir con otros requisitos, tiene que obtener **"aquellos permisos que pudieran requerírsele bajo las disposiciones de la Sección 404 de la Ley Federal Sobre el Control de Contaminación de Agua"**. Sección 7.02, Reglamento de Zonas Inundables, *supra*, (énfasis suplido).

Considerando lo anterior, resulta forzoso concluir que los proponentes tienen que someter al Cuerpo de Ingenieros el estudio jurisdiccional que le fue requerido. Si dicha agencia federal determina que tiene jurisdicción, ella determinará, de acuerdo a la legislación federal aplicable, si el proyecto propuesto requiere un permiso y las condiciones del mismo, o si el proyecto está exceptuado del mismo. No erró el foro apelativo al determinar que los peticionarios tienen que gestionar un permiso del Cuerpo de Ingenieros.

Ahora bien, en lo que los peticionarios sí tienen razón es en que la falta de un permiso del Cuerpo de Ingenieros del Ejército de Estados Unidos, **en esta etapa**, no ameritaba

---

[37] Estas agencias son: el Departamento de Recursos Naturales, la Junta de Calidad Ambiental, el Servicio de Pesca y Vida Silvestre de Estados Unidos, el Cuerpo de Ingenieros del Ejército de Estados Unidos. Además, el Municipio de Mayagüez condicionó su endoso a que se cumplieran las condiciones del permiso del Cuerpo de Ingenieros.

la revocación de la aprobación de la consulta de ubicación. Según surge de las comunicaciones de las agencias comentadoras, las cuales fueron adoptadas tanto por la Junta de Planificación como por la Junta de Calidad Ambiental, la aprobación de la consulta de ubicación, y por ende **de las etapas posteriores necesarias para poder construir y desarrollar en el predio**, está subordinada al cumplimiento de diversos reglamentos y a la obtención de múltiples permisos, aparte del que pudiera exigir el Cuerpo de Ingenieros. [38] Ello significa que los proponentes deberán cumplir con dichos requisitos, **antes** de que puedan comenzar los trabajos de desarrollo o construcción en el predio. Como se sabe, lo que prohíbe el "Clean Water Act" es la descarga de contaminantes en las aguas de Estados Unidos, incluyendo humedales, sin que se cumplan los términos y condiciones expuestos en dicha Ley para autorizar las descargas. 33 U.S.C. secs. 1311(a), 1344. Véase además <u>Mayagüezanos por la Salud y el Ambiente v. J.C.A.</u>, 141 D.P.R. 1, 3 (1996), (Voto Particular de Conformidad del Juez Asociado señor Hernández Denton).

Como la aprobación de una consulta de ubicación no autoriza el desarrollo del predio o el comienzo de la construcción de la obra, Sección 10.00 del Reglamento de Procedimientos Adjudicativos de la Junta de Planificación,

---

[38] Por ejemplo, la Junta de Calidad Ambiental indicó que previo a dar comienzo a la construcción o efectuar algún movimiento de tierra, los proponentes deben obtener Permisos: de Fuente de Emisión (PFE), de Actividad Generante de Desperdicios Sólidos y Para el Control de la Erosión y de la sedimentación.

*supra*, la Junta de Planificación no erró al utilizar su discreción y aprobar la consulta de ubicación con la condición, entre muchas otras, de que se cumplieran con los requisitos que pudiera imponer el Cuerpo de Ingenieros, aunque al momento en que se aprobó la consulta todavía no se hubiera culminado dicho proceso. Lo que debe quedar claro es que los proponentes tienen que cumplir con lo que se le ordenó antes de poder comenzar los trabajos del proyecto. No proceder así, según lo advirtió el Cuerpo de Ingenieros, podría resultar en una violación a la Ley federal. 33 U.S.C. sec. 1311.

III

Recapitulando, por los fundamentos expuestos en esta Opinión hemos resuelto las diversas cuestiones planteadas de la siguiente manera. En cuanto a los requisitos aplicables a los cambios de zonificación y a los desarrollos extensos, señalamientos de error primero y segundo, se confirma la Sentencia recurrida en cuanto a la revocación de la consulta de ubicación, por el fundamento de que no se determinó por la Junta de Planificación que el proyecto propuesto sea compatible con el Plan de usos de terrenos **vigente** al momento de aprobarse la consulta, específicamente los "Objetivos y Políticas Públicas del Plan de Usos de Terrenos", en violación a la Ley de Planificación y al Reglamento de Zonificación. A esos efectos, se devuelve el caso a la Junta de Planificación para que cumpla con lo anterior. Debido a la disposición del caso en cuanto a este

punto, resulta innecesario que nos pronunciemos en cuanto a la facultad de la Junta para enmendar su error en cuanto al cambio de zonificación otorgado, C-4 en vez de C-2, señalamiento de error número tres.

Se confirma la Sentencia del Tribunal de Apelaciones también en tanto concluye que los proponentes deberán presentar un estudio hidrológico-hidráulico y continuar las gestiones ante el Cuerpo de Ingenieros del Ejército de Estados Unidos según le fue instruido por las agencias, señalamientos de error sexto y séptimo.

En cuanto a lo planteado en torno al cumplimiento con la Ley de Política Pública Ambiental y el Reglamento de Procedimientos Adjudicativos, señalamientos de error cuarto y quinto, se revoca la sentencia del Tribunal de Apelaciones.

Se dictará sentencia de Conformidad.


                                    JAIME B. FUSTER BERLINGERI
                                         JUEZ ASOCIADO

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Juan Hernández, José Juan
Álvarez y Otros
    Peticionarios

        vs.

Centro Unido de Detallistas,      CC-2004-816    Certiorari
Etc.
    Recurridos


Junta de Planificación
    Agencia Revocada


SENTENCIA


San Juan, Puerto Rico, a 10 de agosto de 2006.


Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de la presente Sentencia, se resuelve que:

En cuanto a los requisitos aplicables a los cambios de zonificación y a los desarrollos extensos, señalamientos de error primero y segundo, **se confirma la Sentencia recurrida** en cuanto a la revocación de la consulta de ubicación, por el fundamento de que no se determinó por la Junta de Planificación que el proyecto propuesto sea compatible con el Plan de usos de terrenos vigente al momento de aprobarse la consulta, específicamente los "Objetivos y Políticas Públicas del Plan de Usos de Terrenos", en violación a la Ley de Planificación y al Reglamento de Zonificación.

A los efectos antes señalados, **se devuelve el caso a la Junta de Planificación** para que cumpla con lo anterior. Debido a la disposición del caso en cuanto a este punto, resulta innecesario que nos pronunciemos en cuanto a la facultad de la Junta para enmendar su error en cuanto al cambio de zonificación otorgado, C-4 en vez de C-2, señalamiento de error número tres.

**Se confirma la Sentencia del Tribunal de Apelaciones** también en tanto concluye que los proponentes deberán presentar un estudio hidrológico-hidráulico y continuar las gestiones ante el Cuerpo de Ingenieros del Ejército de Estados Unidos según le fue instruido por las agencias, señalamientos de error sexto y séptimo.

En cuanto a lo planteado en torno al cumplimiento con la Ley de Política Pública Ambiental y el Reglamento de Procedimientos Adjudicativos, señalamientos de error cuarto y quinto, **se revoca la sentencia del Tribunal de Apelaciones**.

Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. **Los Jueces participan por Regla de Necesidad.**

La Juez Asociada señora Fiol Matta está conforme con la Opinión del Tribunal, pero disiente en cuanto a la determinación tomada sobre la necesidad de preparar una declaración de impacto ambiental. Según el criterio de la Juez Asociada señora Fiol Matta, "el proyecto propuesto podría tener un impacto ambiental significativo debido a su cercanía a la Reserva Natural caño La Boquilla y por la presencia de humedales en la zona. Frente a la obligación constitucional y estatutaria de conservar nuestros recursos naturales, la norma de deferencia judicial no debe ser obstáculo para que este Tribunal examine de manera rigurosa la corrección de la decisión administrativa respecto a la necesidad de una Declaración de Impacto Ambiental. Casos como el de epígrafe, en los cuales áreas de gran sensibilidad ecológica pueden verse adversamente afectados, requieren que este Tribunal emita su juicio en aras de asegurar 'la más eficaz conservación de sus recursos naturales, así como el mayor desarrollo y aprovechamiento de los mismos para el beneficio general de la comunidad. . .'. Const. ELA art. VI, sec. 19."

El Juez Presidente señor Hernández Denton está inhibido. El Juez Asociado señor Rivera Pérez no intervino.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo